UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

IMHOTEP H'SHAKA,

*Plaintiff*,

-against-                                        17-CV-0108

                                                 GTS/ATB

JOSEPH BELLNIER; MAUREEN BOSCO; DEBORAH
MCCULLOCH;   JOANNE   WALDRON;   JOSEPH
PORCELLI;  KEVIN  RANDALL;  DAVID  LUCIA;
JUSTIN DELISLE,

*Defendants*.

---

## MEMORANDUM OF LAW
## IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

Bruce J. Boivin
Assistant Attorney General, of Counsel
Bar Roll No. 507894
Telephone:  518-776-2590                    Date: December 4, 2017

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................. 2

STATEMENT OF THE CASE ................................................................................... 3

ARGUMENT ............................................................................................................. 8

                PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF ............................ 8

                        A.       Plaintiff Cannot Show Irreparable Harm ........................................ 9

                        B.       Plaintiff Has Not, and Cannot, Demonstrate a Likelihood of Success on the Merits.................................................................. 10

                        C.       The Balancing of Equities Tips in Defendants' Favor................. 19

CONCLUSION........................................................................................................ 20

i

**PRELIMINARY STATEMENT**

Plaintiff is an inmate in the custody of the New York State Department of Corrections and Community Supervision (DOCCS).  He is currently confined at the Clinton Correctional Facility's Special Housing Unit (SHU) in an administrative segregation (ad seg) status.  Inmates in ad seg have been determined to pose a threat to the safety and security to the prison.  Additionally, plaintiff has been designated as one of only 27 inmates requiring Central Office Review of his ad seg status.  The 27 inmates receiving Central Office Review are all high-profile inmates who represent the most significant challenges to maintaining the safe and secure operation of DOCCS facilities.

Plaintiff commenced this action pursuant to 42 U.S.C. § 1983, through counsel, on January 31, 2017.  Dkt. No. 1. The complaint alleges violations of plaintiff's Eighth and Fourteenth Amendment rights.  *Id*.  In general terms, plaintiff asserts that his Fourteenth Amendment procedural due process rights were violated because he has not received meaningful review of his ad seg status.  He asserts that his Eighth Amendment rights were violated due to the conditions of his confinement in SHU and the deliberate indifference to his mental health needs.  In addition to money damages, he seeks injunctive relief "ordering defendants to ameliorate the conditions under which H'Shaka is held and provide H'Shaka with mental health treatment and/or programming." *Id*. p. 35.

 Currently before the Court is plaintiff's motion for a preliminary injunction "enjoining Defendants from keeping Plaintiff H'Shaka in the special housing unit under the administrative segregation program in violation of his procedural due process rights."  In the memorandum of law supporting his motion, plaintiff asserts that he is seeking "an order requiring Mr. H'Shaka to

2

be released from Ad Seg within 30 days of the order." Dkt. No 17-1. P. 14. As such, plaintiff is seeking greater relief through this PI motion than he seeks in his complaint and further seeks a mandatory injunction that will change the *status quo*.

Plaintiff's PI motion is directed solely at defendants Bellnier, (the former Deputy Commissioner for Facility Operations) and Porcelli, Delisle, and Lucia (three Correction Sergeants at Clinton Correctional Facility). Dkt. No 17-1, p. 19 ftnt 8. It also only seeks relief related to plaintiff's ad seg confinement. *Id*. p.7, ftnt 2.

We respectfully note that defendant Bellnier has retired from DOCCS service. James O'Gorman currently fills the position of Acting Deputy Commissioner for Correctional Facilities. O'Gorman Decl. ¶ 1. As such, pursuant to Fed. R. Civ. P. 25, Mr. O'Gorman should be automatically substituted as Mr. Bellnier's successor in office for any official capacity claims asserted in the complaint.

Defendants oppose plaintiff's motion and respectfully submit that he cannot meet the high burden necessary to receive the injunctive relief he seeks. For the reasons set forth below, plaintiff is not entitled to the injunctive relief he seeks and his motion should be denied.

## STATEMENT OF THE CASE

Plaintiff began his DOCCS incarceration on August 5, 1991 following his conviction for second-degree murder, serving a sentence of 25 years to life. Cmplt. ¶ 91; Hull Decl. Exh 2, p. 000404. That crime involved an incident where plaintiff was acting in concert with a co-defendant who hit the victim in the head with a baseball bat, knocking the victim to the ground. While on the ground, plaintiff pulled a weapon and fired into the victim's body, causing his death. Hull Decl. Exh. 2, p. 000407. Plaintiff's criminal history began at age 13. Prior to his murder

3

conviction, he received a felony conviction for assault in the second degree while incarcerated in a Division for Youth (DFY) facility. He was also charged with two assaults in a correctional facility. *Id*.

On January 14, 1996, while in the general population at Coxsackie CF, then going by the name Corey Heath, plaintiff acted in concert with another inmate who passed him a razor blade. Plaintiff threatened to kill a correction officer then slashed the officer several times with the razor. He then attacked two other officers that responded to the incident by slashing them with the razor. Hull Decl. Exh. 1, p. 000001; Exh. 5, p. 000430. Following this incident, plaintiff was convicted of Assault in the First Degree and received an additional sentence of 15 years. *Id*. and Hull Decl. Exh. 2, p. 000404. During the trial, after the judge ordered his mechanical restraints removed, plaintiff attacked his co-defendant and ran from the courtroom. A razor was found on the floor where the attack took place. Hull Decl., Exh. 5, p. 000430.

In addition to his criminal conviction for the January 1996 assault on staff, plaintiff received a misbehavior report for assault on staff. Following a disciplinary hearing, plaintiff received a penalty of approximately 12 years of disciplinary confinement in SHU. Cmplt. ¶ 94.

On November 3, 2010, shortly before plaintiff completed his disciplinary penalty in SHU[1] he was served with a recommendation for ad seg confinement. Hull Decl. Exh. 5. That recommendation described the above misconduct and further elaborated on plaintiff's propensity for extreme violence by noting 15 misbehavior reports plaintiff accumulated since the 1996 assault

---

[1] Plaintiff accumulated several years of additional SHU time for misconduct committed while in SHU. Cmplt. ¶¶ 98-101.

on staff, 17 Unusual Incident Reports, and his gang affiliation.  *Id*.   Following an administrative

hearing, on November 30, 2010, plaintiff was designated as an ad seg inmate.  Cmplt. ¶¶ 109-111.

Ad seg is a form of restrictive confinement used when it has been determined that an

inmate's presence in general population presents a present and future threat to the safety and

security of the facility.  O'Gorman Decl. ¶ 14; Kelly Decl., Exh. A, § 301.4 (b).  The most

challenging ad seg inmates require central office review.  O'Gorman Decl. ¶ 15.  DOCCS manages

approximately 50,000 inmates; of those, only 27 are ad seg inmates designated as requiring central

office review.  Plaintiff is one of those 27 inmates.  *Id*. ¶16.

In order to assess the appropriateness of continued ad seg confinement for an inmate

designated for central office review, DOCCS has established a three-part review process that, until

July 2017, took place every 60 days.  It now takes place every 30 days.  O'Gorman Decl.  ¶¶ 19-

22 ; Kelly Decl. ¶¶ 15-24, 40 and Exh. A thereto at § 301.4 (d) – (e).  That process, described in

detail in those references, is summarized below.

The first step occurs at the facility.   A three-member committee, consisting of a

representative of the facility executive staff, a security supervisor, and a member of the guidance

and counseling staff, convenes to review the inmate's institutional record. The facility committee

prepares a report and submits it to the superintendent of the prison.  That report details the reasons

why the inmate was initially determined to be appropriate for ad seg, information on the inmate's

subsequent behavior and attitude, and any other factors the committee believes may favor retaining

the inmate in or releasing the inmate from ad seg. After the facility review, the superintendent

forwards the facility committee's report and any written response that the inmate submits to the

DOCCS central office.

5

The second step of the review process occurs at the DOCCS central office. The central office review committee also has three members.  The central office committee consists of a representative from the office of facility operations, a member of the DOCCS Office of Special Investigations (formerly known as the Inspector General), and an attorney from the office of counsel.  The central office review committee reviews the facility committee's report, develops its own recommendation whether the inmate continues to pose a safety threat to the facility, and forwards the paperwork to the Deputy Commissioner for Correctional Facilities.

The third step of the review process rests with the Deputy Commissioner for Correctional Facilities.   The deputy commissioner reviews the facility and central office committee recommendations, any written statement submitted by the inmate, and decides whether to continue the inmate in ad seg. Once the deputy commissioner makes a final decision, he notifies the superintendent of the inmate's prison facility, who provides written notice to the inmate of the decision and its reasons, and a statement notifying the inmate of his right to submit a written statement for the next periodic review.

This periodic review process has been followed since plaintiff's placement in ad seg. Copies of the reviews are attached to the Hull Decl. at Exh. 1.  To date, no member of the facility or central office committee has recommended the termination of plaintiffs' ad seg status. O'Gorman Decl. ¶ 47.

Plaintiff is currently one of twelve inmates housed in 4 company in the Clinton Correctional Facility SHU.  The front of his cell has open bars, which do not restrict his ability to

speak with either other inmates or staff.  Plaintiff, like most of the other inmates in the company, spends his day speaking socially with the other inmates in the company. Randall Decl. ¶¶ 32-33.

All inmates at Clinton CF are housed in single-occupancy cells, whether in general population or SHU. *Id*.  ¶ 34.

 In addition to his constant interaction with the other inmates in the company, many staff members conduct rounds throughout the day and speak with plaintiff.  During "rounds," staff members walk throughout the SHU and speak individually with plaintiff and all the other inmates. Some of those conversations are general chit-chat. Other times, specific problems or concerns are discussed.  *Id.*  ¶¶ 35-36.

In addition to his daily interactions with SHU staff, plaintiff is seen during hourly rounds by a correction officer, and daily rounds by a medical nurse, an Office of Mental Health ("OMH") nurse, and OMH counselor.   A Lieutenant makes one round per day, interacting with each inmate, and the Captain, Superintendent, Deputy Superintendent for Security, and OMH Chief each visit SHU weekly.  All of these individuals have, and do, interact personally with plaintiff.  *Id.*  ¶¶ 38-40.

In addition to this extensive human contact, inmate H'Shaka is provided with daily recreation in the exercise yard.  He is confined in a recreation cell, which is open to the fresh air and plaintiff can speak with other inmates in the yard.  *Id.*  ¶ 41.

7

## ARGUMENT

## PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF

Plaintiff cannot meet his weighty burden of demonstrating that a preliminary injunction is required. Preliminary injunctive relief "'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

"In general, district courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.'" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Lynch v. City of N.Y.*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted)).

However, when the moving party seeks a "mandatory preliminary injunction that alters the status quo by commanding a positive act," the burden is "even higher." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (internal quotation marks omitted)). Thus, a mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Citigroup Global Mkts.*, 598 F.3d at 35 n.4 (internal quotation marks omitted).

8

### A.      Plaintiff Cannot Show Irreparable Harm

"'A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transport Malmo AB v. Wabtec Corp*., 559 F.3d 110, 118 (2d Cir. 2009) (*quoting Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir.1999)).   Speculative, remote, or future injury is not the province of injunctive relief.  *Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983).  Rather, a plaintiff seeking to satisfy the irreparable harm requirement must demonstrate that "absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley*, 559 F.3d at 118 (internal citation and quotation marks omitted).

In his motion for injunctive relief, plaintiff cites two bases for irreparable injury: 1) the alleged deprivation of liberty without due process as a *per se* irreparable injury, and 2) the generalized, speculative continuing risk to plaintiff's health and psychological well-being.

The asserted constitutional basis is a circular argument.  Plaintiff does no more that assert that his constitutional rights were violated.  He must establish a violation, or at least a likelihood that he can do so.  As discussed below, this he cannot do.  As the accompanying declarations demonstrate, the three-tiered review process which DOCCS conducts to determine whether continued ad seg confinement is appropriate meets the standard set forth in *Hewitt v. Helms*, 459 U.S. 460 (1983).

In support of his alleged health and psychological harm, plaintiff submitted a number of medical records.  The medical records demonstrate that he has suffered from a recurring rash periodically the last three years, for which he received treatment.  See generally, Plaintiff's Exhibit

9

13.   The records also indicate that inmate H'Shaka has complained of heart rate problems approximately three years ago, and have a recurring note that plaintiff has suffered from anxiety. *Id.* at pp. 16, 19-20, 25, 28, 31-32.   As to his mental health issues, plaintiff submits written grievances (Plaintiff's Exhibit 13 at pp. 34-43) and his declaration, which states in paragraph 17 that he suffers from anxiety and lack of sleep.   He also self-diagnoses that his skin conditions (such as the hives and rashes detailed in the medical records used to support his motion), are a symptom of his anxiety and declining mental health.   As the accompanying declaration of Joanne Waldron demonstrates, DOCCS carefully monitors plaintiff's mental health and provides appropriate treatment as necessary.   He is classified as a level 3 patient and has been stable at that classification for a year and a half.   Despite plaintiff's complaints, concerns, and reference to medical records, he is not now, nor has he ever been, diagnosed with a serious mental illness.   His most common, re-occurring, ailment is skin irritation, which is typically resolved with Benadryl.   As such, all of plaintiff's arguments about the potential mental health consequences of prolonged ad seg confinement are merely arguments which suggest the speculative possibility of remote or future harm.

Accordingly, plaintiff has failed to prove irreparable harm as it relates to both his medical treatment and access to his legal mail, rendering his current preliminary injunctive motion without merit.

**B.     Plaintiff Has Not, and Cannot, Demonstrate a Likelihood of Success on the Merits**

In order to establish an entitlement to preliminary injunctive relief, plaintiff must prove that he will likely prevail on his constitutional due process claim at trial.   Plaintiff cannot meet his burden.

10

To prevail on a procedural due process claim, plaintiff must demonstrate, first, that the defendants deprived him of a cognizable interest in life, liberty, or property," and, second, did so without affording him constitutionally sufficient process.  U.S. Const. amend. XIV § 1; *Wolf v. McDonnell*, 418 U.S. 539, 556 (1974).  At least for the purpose of this motion, defendants concede that plaintiff has established a liberty interest in avoiding lengthy restrictive confinement.  *See, e.g., Sandin v. Conner*, 515 US 472, 486 (1995); *Colon v. Howard*, 215 F. 3d 227, 228 (2d Cir. 2000).  Plaintiff, however, cannot establish that the process he was afforded was constitutionally deficient.

The process due an inmate placed in ad seg is minimal.  Before placing an inmate in ad seg, prison officials need only conduct "an informal, nonadversary hearing" and the inmate merely needs to receive "some notice of the charges against him and an opportunity to present his views." *Hewitt v. Helms*, 459 U.S. 460, 476 (1983).  The Court also held that "administrative segregation may not be used as a pretext for indefinite confinement." *Id.* at 477, ftnt. 9.  To that end, "[p]rison officials must engage in some form of periodic review of the confinement of such inmates." *Id. Hewitt* did not articulate the parameters of the periodic review, but the Court did counsel:

> The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner -- which have been ascertained when determining to confine the inmate to administrative segregation -- and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner.

*Id.*

There has been little guidance from the Courts about the procedural due process requirements of the periodic reviews until this year when the Second Circuit issued its decision in *Proctor v. LaClaire*, 846 F 3d 597 (2d Cir 2017).  The Court acknowledged that it was required to

11

assess a "view of inmate procedural due process this Court has yet to address." *Proctor* at 608. After making that assessment, the Court concluded that three things were required to satisfy procedural due process during a periodic review of ad seg confinement.

> First, the reviewing prison officials must actually evaluate whether the inmate's continued Ad Seg confinement is justified. *See Hewitt, 459 U.S. at 477 n.9.*
>
> Second, the reviewing officials must evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available.
>
> Third and finally, the reviewing officials must maintain institutional safety and security (or another valid administrative justification) as their guiding principles throughout an inmate's Ad Seg term.
>
> *Id.* at 610-611.

Defendants respectfully submit that the formal periodic review process described above and in the accompanying declarations of SGT Randall, Director Kelly, and Deputy Commissioner O'Gorman establish that DOCCS complies with the standards announced in *Proctor*[2].  That three-step process receives the input from the facility personnel who have daily contact with plaintiff, from more senior officials assigned to the central office who make an even larger global assessment of plaintiff's record, and finally by a deputy commissioner who considers the committee recommendations and applies his personnel experience before making a determination.

---

[2] While not specifically relevant to the issue of this motion, New York State DOCCS provides significantly more formal due process to an inmate under consideration for ad seg confinement than is required by *Hewitt*.  The initial placement of an inmate in ad seg takes place only after a formal departmental hearing.  Kelly Decl. ¶ 14 and Exh A thereto.  We mention this fact here as evidence of the DOCCS commitment to a fair and thorough process related to ad seg confinement.

The declarations demonstrate that the review process is focused on exactly the criteria articulated by *Proctor*.

While plaintiff acknowledges that the required periodic reviews took place, he asserts several points to establish his argument that the reviews are a sham because they are preordained. First, he cites the fact that the section of the review form describing the reason for initial placement in ad seg is "cut-and pasted" from one review to the other.  Second, plaintiff makes much of the fact that the final report of some of the periodic reviews were delayed in their transmission to plaintiff, which prevented him from timely objecting to or adding new information before the next review took place.  Third, he argues that all of the reviews give weight to plaintiff's past violent conduct which occurred years ago, without considering his current conduct.  Fourth, he cites to several reviews that contain comments describing appropriate behavior, but recommending continued ad seg placement.  Fifth, he cites the fact that there has never been a recommendation for release.

 Plaintiff's first argument has no merit.  The reason plaintiff was placed in ad seg initially does not change.  That portion of the form merely records that information.  O'Gorman Decl. ¶ 31; Kelly Decl. Exh. A, § 301.4 (d) (1).

Plaintiff's second argument, the occasional delay in transmission of the ad seg review reports which prevents him from adding new information to the next review, also provides no weight to his argument.  As an initial matter, there is no requirement that prison officials to permit submission of any additional statements or evidence during the periodic reviews.  *Hewitt* at 477,

ftnt. 9.  To the extent that plaintiff argues that state law or regulations do allow this, his argument has no merit in federal court.

It is well settled that only rights "secured by the Constitution and federal laws" are within the ambit of § 1983.  *Baker v. McCollan*, 443 U.S. 137, 140 (1979).  Rights secured by the laws of the states fall outside that compass.  *Polinow v. Glennon*, 757 F 2d 496, 501 (2d Cir 1985), citing *Davis v. Scherer*, 468 U.S. 183, 194 (1984).  Violation of state procedural requirements does not give rise to § 1983 liability.  *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995); *Gutierrez v. Coughlin*, 841 F.2d 484 (2d Cir. 1988); *Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987), *cert. denied*, 484 U.S. 896 (1987); *see also LaBoy v. Coughlin*, 822 F.2d 3 (2d Cir. 1987).  "The mere expectation of receiving a state afforded process does not itself create an independent liberty interest protected by the Due Process Clause."  *Watson v. City of New York*, 92 F.3d 31, 38 (2d Cir. 1996) (*quoting Doyle v. Oklahoma Bar Ass'n*, 998 F.2d 1559, 1570 [10th Cir. 1993]).

Notwithstanding this fact, any comments made orally by plaintiff at the facility to staff, are reported to the central office review committee during the committee phone call with the facility. Kelly Decl. ¶ 43.

Plaintiff's third and fourth arguments, that the reviewers give weight to his lengthy past violent conduct without considering his current behavior and that some of the reviews note his appropriate behavior but recommend continued ad seg confinement, are interconnected and are belied by the declarations accompanying this response. While articulating the three criteria, the *Proctor* decision also acknowledged that past events are an important consideration:

> This is not to say that prison officials are barred from according significant weight to events that occurred in the past. Neither do we suggest that recent events categorically ought to be more salient in periodic reviews than those that occurred

long ago. We conclude merely that prison officials must look to the inmate's present and future behavior and consider new events to some degree to ensure that prison officials do not use past events alone to justify indefinite confinement.

*Proctor* at 611.

Each of the declarants have significant experience with DOCCS and each asserts that he applies that experience to his recommendation, after considering both plaintiff's past conduct, current behavior, and expected future behavior.

Deputy Commissioner O'Gorman describes plaintiff's lifelong violent history and the vicious attack on staff with a razor while plaintiff was in general population. He explains that past behavior is always a consideration in predicting future behavior and that horrific past behavior weighs heavily in the ultimate decision of whether plaintiff continues to present a threat to the safe, secure operation of any prison in which he is confined. O'Gorman Decl. ¶¶ 32-39. He also acknowledges the reports of plaintiff's recent appropriate behavior while in SHU. *Id.* ¶¶ 40-46. With the paramount concern of the safe, secure operation of the prison, he has consistently determined that plaintiff remains a current threat to that safe, secure operation. *Id.* ¶¶ 28, 47. Nonetheless, Mr. O'Gorman declares that finding alternate appropriate placement outside of ad seg is considered at every review and that plaintiff is on the right path to demonstrating that such an arrangement may be appropriate. *Id.* ¶¶

Director Kelly's duties include the monitoring of high risk inmates, including those designated with central office ad seg review; he also serves as chairman of the central office review committee. Kelly Decl. ¶¶ 5-8. In that capacity, he visits every ad seg inmate and has been visiting plaintiff for over 6 years. *Id.* ¶¶ 9-11. Before making his recommendation, he not only reviews the facility recommendation, but facilitates a phone call with the facility housing plaintiff to

receive up-to-the minute information about plaintiff's medical and mental health, demeanor, and mood.  He also seeks information about any oral statements made by plaintiff regarding his ad seg confinement and his interactions with staff and other inmates.  Id. ¶¶ 20-21.  After gathering that information, he and the central office committee assess whether plaintiff presents a current threat to the safe, secure operation of the prison and what future threats would be posed by his release from ad seg.  *Id.* ¶ 23.

Key considerations to his recommendation include past behavior, interaction with staff and other inmates, and violations of DOCCS rules or manipulation of the system.  He acknowledges that based upon reports and personal observations, plaintiff appears to be behaving appropriately in his current setting.  His challenge is predicting how, or if, plaintiff's appropriate behavior would change if released from ad seg.  *Id.*  ¶¶ 25-32.  He notes that a recent misbehavior report plaintiff received for making a three-way telephone call during an authorized call creates concern about plaintiff's ability or willingness to conform to the rules.  During that particular call, plaintiff was checking on the status of one of the victims he attacked at Coxsackie in 1996, which raised concern that plaintiff had a nefarious purpose to the call.  *Id.* ¶¶ 33-37.  With all those considerations in mind, Mr. Kelly concludes that plaintiff remains a threat to the safe, secure operation of the prison, but that if plaintiff demonstrates that he will go back to his pattern of appropriate behavior, he foresees a day when he can recommend release from ad seg to a less restrictive environment.  *Id.* ¶¶ 38-39.

SGT Randall has had daily contact with plaintiff for two years and twice-weekly contact for the past two years.  Randall Decl.  ¶¶ 7-8.  He describes how his interactions with plaintiff have been generally positive and that they regularly discuss matters related to plaintiff's confinement.

16

*Id.* ¶¶ 9-14.  Notwithstanding those good interactions, he describes how he has seen plaintiff lose his temper over inconsequential things when he does not get his way and go from "0-60."  *Id*. ¶ 15.  On one such occasion, plaintiff became irate and inconsolable for days after SGT Randall explained that an article of clothing plaintiff ordered by mail would not be delivered because it was not from an approved vendor.  Had plaintiff not been behind bars or in full restraints, SGT Randall believes that he would have been in danger and at risk to an assault by plaintiff.  *Id*. ¶¶ 16-17.

This sort of behavior, despite plaintiff's generally appropriate interactions with staff and other inmates, coupled with plaintiff's past violent history, leads SGT Randall to conclude that plaintiff would be a danger to the facility if released to general population at this time.  He explains that in general population, plaintiff would be subject to innumerable interactions with other inmates and staff in a far less controlled environment than ad seg.   He concludes that based upon his experience with plaintiff's anger control issues, particularly with inconsequential matters, he demonstrates the potential of causing greater conflict in a less restrictive environment.  *Id*.  ¶¶ 18-26.  Nonetheless, SGT Randall is open-minded about recommending plaintiff's release from ad seg.  Once plaintiff can demonstrate his ability to control his anger and discuss matters maturely and rationally, he will recommend that plaintiff be released from ad seg to a less restrictive environment.  *Id*.  ¶¶ 27-28.

The declarations demonstrate that the defendants are not solely focusing on plaintiff's past violent conduct, but also consider his current behavior and an assessment of plaintiff's future behavior.  This sort of review is exactly the type of comprehensive review the *Proctor* decision seeks.  *Proctor* at 611.  ("We conclude merely that prison officials must look to the inmate's

present and future behavior and consider new events to some degree to ensure that prison officials do not use past events alone to justify indefinite confinement.")

Plaintiff's final argument that his due process rights were violated rests on an assertion that it must be so because no one has ever recommended his release.  This argument is particularly meritless.  A fair reading of the totality of plaintiff's argument leads to the inescapable conclusion that that plaintiff merely disagrees with the DOCCS officials' decision to maintain his ad seg status; he is really asking the Court to substitute its judgment for that of the DOCCS officials charged with maintaining the safe and secure operation of the prison.  This request is improper.

As the *Proctor* decision make clear, the Court "may not substitute our judgment for Defendants', nor may we rebalance the section 301.4(d) criteria. The Due Process Clause permits only an evaluation of whether Defendants' method for coming to their Ad Seg determinations is sufficient."   Indeed, it is well-settled that the Courts must afford "wide-ranging deference in the adoption and execution of policies" designed to promote institutional safety.  *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

In conclusion, the record before the Court demonstrates that the defendants are, and have been, in compliance with the *Proctor* criteria for ad seg reviews.  They actually evaluate whether plaintiff's continued ad seg confinement is justified.  They evaluate whether the justification for ad seg exists at the time of the review, or will exist in the future, and consider new relevant evidence as it becomes available.  Finally, they maintain institutional safety and security as their guiding principle throughout plaintiff's ad seg term.  There is no evidence before the Court to contradict these assertions.  Accordingly, plaintiff cannot bear his burden of establishing a

likelihood of success on the merits and the Court must deny his motion for a preliminary injunction.

### C.     The Balancing of Equities Tips in Defendants' Favor

In balancing the equities, the scale tips decidedly in defendants' favor.  Plaintiff posits that the scale tips in his favor since his claims are constitutional in nature.  As discussed in detail above, plaintiff has not, and cannot establish that his constitutional rights were violated.

To the contrary, "[t]he state's interest in flexible Ad Seg review procedures--maintaining institutional security--is substantial." *Proctor* at 610.  Institutional safety and security are perhaps a prison facility's most important considerations. *Bell, 441 U.S. at 546-47* (quoting *Pell v. Procunier, 417 U.S. 817, 823, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974))* (citing *Jones v. N.C. Prisoners' Labor Union, 433 U.S. 119, 129, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977)*; *Procunier v. Martinez, 416 U.S. 396, 412, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974)).*

With these compelling interests in mind, defendants respectfully submit that the balance of equities tips decidedly in defendants' favor and the motion must be denied.

**CONCLUSION**

Plaintiff has failed to make the required showing of irreparable harm, or a likelihood of success on the merits of this claim.  Thus, there is no legal basis for this Court to award any relief. Plaintiff's motion should be denied.

Dated:  Albany, New York
         December 4, 2017

                              ERIC T. SCHNEIDERMAN
                              Attorney General of the State of New York
                              Attorney for Defendants Bellinier, Delisle,
                                      Porcelli, and
                              The Capitol
                              Albany, New York 12224-0341


                              By: s/ Bruce J. Boivin
                              Bruce J. Boivin
                              Assistant Attorney General, of Counsel
                              Bar Roll No. 507894
                              Telephone:  518-776-2590
                              Email: bruce.boivin@ag.ny.gov

TO:     Alissa R. Hull, Esq. VIA CM/ECF
        Michael E. Cassidy, Esq. VIA CM/ECF
        Steven G. Storch, Esq. VIA CM/ECF