**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**IMHOTEP H'SHAKA,**

                            *Plaintiff,*                      **AMENDED COMPLAINT**

             -against-

**JAMES O'GORMAN, Acting Deputy Commissioner for**        9:17-cv-00108-GTS-ATB
**Correctional Facilities, Department of Corrections and**
**Community Supervision, JOSEPH BELLNIER, Former**
**Deputy Commissioner for Correctional Facilities, Department**
**of Corrections and Community Supervision, MAUREEN**
**BOSCO, Former Executive Director, Central New York**
**Psychiatric Center, DEBORAH MCCULLOCH, Executive**
**Director, Central New York Psychiatric Center,**
**JOANNE WALDRON, Office of Mental Health Unit**
**Chief, Clinton Correctional Facility, JOSEPH PORCELLI,**
**Offender Rehabilitation Coordinator, Clinton Correctional**
**Facility, KEVIN RANDALL, Sergeant, Clinton Correctional**
**Facility, DAVID LUCIA, Acting Deputy Superintendent of**
**Security, Clinton Correctional Facility, JUSTIN DELISLE,**
**Sergeant, Clinton Correctional Facility,**

                                 *Defendants.*
_____

## PRELIMINARY STATEMENT

1.      This is a civil rights action by Imhotep H'Shaka ("H'Shaka" or "Plaintiff") a state prison inmate, pursuant to 42 U.S.C. § 1983, the Eighth and Fourteenth Amendments of the United States Constitution.

2.      H'Shaka has been confined in defendants' Special Housing Unit (SHU) and Administrative Segregation ("Ad Seg") for over 20 consecutive years. H'Shaka is presently confined by himself in a windowless, concrete cell for between 22 and 24 hours a day. He is not allowed vocational, recreational or educational programming. He eats alone off a styrofoam tray provided through a slot in his door and obtains exercise alone in a small empty "human kennel:" a pen enclosed by high concrete walls or fencing, without any other equipment or structures. Any time H'Shaka is taken out of his cell, whether to exercise or for a medical appointment, he is transported with his hands shackled to his waist. These are typical conditions and procedures for prisoners in Administrative Segregation. H'Shaka seeks injunctive and declaratory relief, as well as compensatory and punitive damages for defendants' deliberate indifference to H'Shaka's serious medical needs and violations of his due process rights.

3.      H'Shaka has been hospitalized at least three times since 2013 for anxiety-related health problems, including rapid heartbeat, vertigo, heart palpitations, inability to walk, chest pains, numbness, uncontrollable shaking, shortness of breath, and itching hives caused by anxiety. Because of his overwhelming fear of being forever confined in a SHU cell, H'Shaka has been placed in mental health observation several times because of suicidal thoughts. He lives with constant anxiety and has a persistent fear of another severe anxiety episode.

4.      While inflicting H'Shaka with this cruel and inhumane treatment, defendants have repeatedly failed and refused to follow their own rules and regulations which require them to

1

conduct a meaningful review of his placement in administrative segregation. By continuing his isolated confinement, defendants have caused, and continue to cause, serious psychological and physiological harm to him. These actions are in violation of H'Shaka's rights under the Eighth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION

5.    This court has jurisdiction of H'Shaka's federal claims pursuant to 28 U.S.C. §§ 1331, 1343 and 28 U.S.C. §§ 2201, 2202.

6.    Remedies are sought under 42 U.S.C. §§ 1983 and 1988 for violations of H'Shaka's rights under the Constitution of the United States.

7.    Venue is proper because the events at issue occurred in the Northern District of New York. 28 U.S.C. § 1391(a)(2).

## PARTIES

8.    H'SHAKA is a 44-year old man, a Rastafarian with an adult daughter, and is presently in the custody of the New York State Department of Corrections and Community Supervision (hereinafter "DOCCS") at Clinton Correctional Facility (hereinafter "Clinton"), in Dannemora, New York. He was on the dates and times hereinafter mentioned, also confined in SHU and/or Administrative Segregation at Upstate Correctional Facility (hereinafter "Upstate") in Malone, New York, Auburn Correctional Facility (hereinafter "Auburn") in Auburn, New York, Attica Correctional Facility (hereinafter "Attica") in Attica, New York, Elmira Correctional Facility (hereinafter "Elmira") in Elmira, New York, Wende Correctional Facility (hereinafter "Wende") in Alden, New York, and Coxsackie Correctional Facility (hereinafter "Coxsackie") in Coxsackie, New York.

9.     Defendant JAMES O'GORMAN was previously Assistant Commissioner for Correctional Facilities for DOCCS, and in or about September 2017, upon the retirement of defendant JOSEPH BELLNIER, became Acting Deputy Commissioner for Correctional Facilities. As such, he is in charge of managing the administrative segregation program and is the final arbiter of deciding H'Shaka's continued isolated confinement. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

10.    Defendant JOSEPH BELLNIER was, until his retirement in or about September 2017, the Deputy Commissioner for Correctional Facilities for DOCCS. As such, he was in charge of managing the administrative segregation program and was the final arbiter of deciding H'Shaka's continued isolated confinement.Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

11.    Defendant MAUREEN BOSCO is the former Executive Director for the Office of Mental Health / Central New York Psychiatric Center. As such, she was in charge of all mental health services provided to prisoners confined in DOCCS. She also directly denied H'Shaka's grievance requesting mental health treatment. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in her official and individual capacities.

12.    Defendant DEBORAH MCCULLOCH is the current Executive Director for the Office of Mental Health / Central New York Psychiatric Center. As such, she is in charge of all mental health services provided to prisoners confined in DOCCS. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in her official and individual capacities.

3

13.     Defendant JOANNE WALDRON is the Office of Mental Health (OMH) Unit Chief at Clinton. As such, she is in charge of mental health services provided to prisoners at Clinton. She also directly denied H'Shaka's request for mental health treatment. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in her official and individual capacities.

14.     Defendant JOSEPH PORCELLI is an Offender Rehabilitation Coordinator at Clinton. He is a member of the facility review committee which recommends H'Shaka's continued placement in indefinite isolated confinement and has been a member of that committee from May 2013 through the present. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

15.     Defendant KEVIN RANDALL is a Sergeant at Clinton. He is the Security Supervisor member of the facility review committee which recommended H'Shaka's continued placement in indefinite isolated confinement in November 2013, May 2014, July 2014, September 2014, and January 2015. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

16.     Defendant DAVID LUCIA was the Acting Deputy Superintendent of Security who was the Committee Chairman member of the facility review committee which recommended H'Shaka's continued placement in indefinite isolated confinement in May 2013, January 2014, January 2015, and March 2015. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

17.     Defendant JUSTIN DELISLE is a Sergeant at Clinton. He is the Security Supervisor member of the facility review committee which recommended H'Shaka's continued placement in indefinite isolated confinement in May 2015 and September 2015. Defendant is a

4

person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

## STATEMENT OF FACTS

18.     H'Shaka is kept under conditions of extreme isolation, sensory deprivation, and restricted movement.

19.     The conditions of administrative segregation ("Ad Seg") constitute an absolute denial of work, cultural, and social opportunities, severely limited recreational and religious opportunities, limited access to personal property, extraordinary levels of surveillance and control, and limited contact with family and loved ones.

20.     H'Shaka, like others in Ad Seg, has absolutely no access to group recreation, group education, group prayer, or group meals.

21.     In addition, H'Shaka is denied all opportunity to attend therapeutic groups or programs for his mental health and behavioral health needs.

22.     H'Shaka is housed in a single-occupancy cell and cannot have a normal human conversation with another prisoner. His only avenue of communication is by speaking loudly enough for the prisoner in a nearby cell to hear. Correctional staff, however, have discretion to issue warnings and may punish such communication as a rule violation.

23.     People yell from cell to cell in an attempt to communicate, and individuals with mental illness or in an agitated state yell and scream incoherently or bang and rattle their cell doors at all hours of day and night and sometimes for extended periods of time.

24.     H'Shaka is provided cleaning materials approximately three times per week to clean his cell. However, there are often weeks or months when no clean up materials are

provided, most recently, none were provided for a five-month period from August 2015 to December 2015.

25.     The cell in which H'Shaka is confined is entirely concrete, measuring approximately nine by eleven feet. The cell has a bed made of steel, a sink, and a toilet. There is a steel desk but no chair upon which to sit. The cell has no window, so H'Shaka has no exposure to natural light. The door to the cell is made of steel bars, and H'Shaka can look across the walkway through a window to the yard. The door has a food slot that an officer may unlock to insert food or mail, and that is also used to handcuff H'Shaka before the door is opened. A wall jack with headphones is provided and there is one radio station and one television station which allow H'Shaka to access the audio only. The cell does not contain an emergency call button, so H'Shaka and other prisoners must yell for help in the event of an emergency, or rely on a staff member noticing that they are in distress.

26.     Bedding consists of a blanket, two sheets, one pillow and one pillowcase, which are allowed to be laundered through the facility laundry once per month.

27.     Property is tightly restricted in Ad Seg and H'Shaka is allowed a total of only 10 books or magazines at any one time. He is allowed one religious book and one dictionary. H'Shaka is allowed newspapers on a bi-monthly basis and must write all legal work and letters with a small plastic pen. H'Shaka is not allowed to receive any packages.

28.     To go outside, H'Shaka must first be handcuffed to a waist chain. He is then taken to a chain link pen measuring approximately nine by eleven feet for one to two hours per day.

29.     The exercise pen is small, with a concrete floor, chain fencing on all sides, including the roof, providing no shelter in inclement weather. There is no exercise equipment or

6

bench to sit on. Rain and snow fall directly into the exercise pens and causes the ground to become slick, wet, and icy. There is no other exercise opportunity for H'Shaka.

30.    H'Shaka, like other prisoners in Ad Seg, has no access to recreational, vocational, or educational programming besides a workbook provided for drug and alcohol addictions and anger management. H'Shaka completed those programs in 2012 and 2010, respectively.

31.    H'Shaka, like other prisoners in Ad Seg, is not allowed to purchase art supplies or hobby or crafting materials.

32.    H'Shaka is eligible for parole in approximately ten years, but has not been allowed to work or attend any programming that might prepare him for release or address any mental health or behavioral issues that he faces.

33.    The failure to complete required programming often results in the denial of parole and H'Shaka is almost certain to be denied parole if he remains in Ad Seg, is confined in Ad Seg when he appears before the parole board, or has not completed programs because of his confinement in Ad Seg.

34.    H'Shaka is allowed a five-minute minute shower in a single shower cell three times weekly.

35.    H'Shaka is not allowed to go to a law library to do legal research, but must write his request on a piece of paper to be fulfilled by the correctional staff and law library inmate clerks. Any general reading material is brought around on a cart to his cell door one time each week.

36.    H'Shaka's communication with loved ones outside the facility is subject to severe restrictions. H'Shaka is housed over 300 miles from his family. When his family can travel for

the visit, they are allowed one visit per week for approximately six hours. His family is allowed to hug and kiss him once at the beginning of the visit and once at the conclusion of the visit.

37.     Through the "Pilot Incentive Program," initiated by DOCCS in 2012, H'Shaka was allowed one thirty-minute phone call per week with family while confined in a cage slightly larger than a phone booth known as a "therapeutic module."

38.     The Pilot Incentive Program provided H'Shaka with one and a half hours to watch television each week while eating limited pre-purchased items from the commissary while in the "therapeutic module" cage. This activity is done alone, with a correctional officer watching guard.

39.     H'Shaka was transported to and from these activities with his hands shackled to his waist.

40.     The Pilot Incentive Program was discretionary and had to be renewed by facility and central office staff every 60 days.

41.     Because of the close confinement of the "therapeutic module" cage, H'Shaka often broke out in itching, swelling hives and feels as if his tongue is swelling from the anxiety of being placed in such a small space.

42.     In the spring or summer of 2017, after the filing of this action, the Pilot Incentive Program was eliminated, making H'Shaka's conditions of confinement even worse.

43.     All defendants are directly responsible for these stark and cruelly destructive conditions.

44.     These conditions in Ad Seg are more restrictive than those placed on prisoners in SHU for recent disciplinary infractions.

45.     These extreme restrictions on human contact and activities are imposed on H'Shaka as a matter of official DOCCS policy and have been approved or implemented by defendants.

### Medical and Mental Health Consequences of SHU

46.     H'Shaka has serious medical conditions which have been caused or exacerbated by his continued isolated confinement for over 20 years.

47.     In addition to being deprived of the minimal civilized measure of life's necessities as described above, H'Shaka is also experiencing unrelenting and crushing mental anguish, including physical pain and suffering as a result of the many years he has spent without normal human interaction in stark and restrictive conditions, without any hope of release or relief.

48.     H'Shaka suffers from severe anxiety, which has caused rapid heartbeat, vertigo, heart palpitations, inability to walk, chest pains, numbness, uncontrollable shaking, shortness of breath, and itching hives caused by anxiety. He has also been diagnosed with vitamin D deficiency and sleep apnea and placed in mental health observation for expressing suicidal thoughts.

49.     The devastating psychological and physical effects of prolonged solitary confinement are well documented by social scientists: prolonged solitary confinement causes prisoners significant mental harm and places them at grave risk of even more devastating future psychological harm. All individuals are at risk of harm from these consequences, not just those with pre-existing health conditions.

50.     Common side effects of prolonged solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation and suicidal thoughts and behaviors. *Davis v. Ayala*,

135 S.Ct. 2187 (2015) (Kennedy, J., concurring) (citing Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006)).

51.     Researchers have demonstrated that prolonged solitary confinement causes a persistent and heightened state of anxiety and nervousness, headaches, insomnia, lethargy or chronic fatigue, lack of energy, lack of initiative to accomplish tasks, nightmares, heart palpitations, and fear of impending nervous breakdowns. Other documented effects include obsessive ruminations, an oversensitivity to stimuli, irrational anger, social withdrawal, hallucinations, mood swings, chronic depression, feelings of overall deterioration, as well as suicidal ideation.

52.     H'Shaka suffers from and exhibits these symptoms as a direct result of his prolonged solitary confinement.

53.     Plaintiff's symptoms arising from his confinement have been extreme.  For instance, his chronic insomnia is so debilitating that at times he is unable to sleep for up to five days at a time.

54.     Over the past three years, H'Shaka has been sent to the emergency room at an outside hospital several times because of anxiety induced cardiac symptoms.

55.     From March, 2013 through the present, H'Shaka has frequently reported to sick call with reports of heart palpitations, vertigo, chest pains, dizziness, arm numbness and tingling, rapid heartbeat, shaking, inability to breathe, tongue swelling, itching hives, tight throat, waves of nausea, inability to walk, and sweating profusely while at rest.

56.     H'Shaka's blood pressure and heart rate are elevated during these sick call evaluations and have been documented as reaching a blood pressure level of 170/80, with a heart rate above 140.

57.     During these sick call evaluations, H'Shaka has been observed by medical staff with his body shaking, raised hives on his body, pacing, and sweating profusely while at rest.

58.     H'Shaka was transported to an outside hospital for emergency treatment of these symptoms, as per available records, on March 28, 2013, April 4, 2013, and October 17, 2014.

59.     H'Shaka has received nitroglycerin, electrocardiograms, echocardiograms, Holter monitors, chest x-rays, an electromyography test, nerve conduction velocity test, and received several cardiology consults.

60.     Medical professionals have concluded that H'Shaka's symptoms "appear to be anxiety related" and have stated that "cardiac has been ruled out."

61.     From March, 2013 until August, 2015, H'Shaka was given Vistaril, Benadryl, and occasionally Prednisone for anxiety related symptoms, although such medications are typically prescribed for allergy symptoms.

62.     These allergy medications were insufficient to treat H'Shaka's anxiety, as H'Shaka continued to report to the Office of Mental Health (OMH) staff, defendant Waldron, and medical staff with his rising anxiety symptoms.

63.     In November and December of 2015, H'Shaka's hives were so problematic he was treated for scabies, but ultimately diagnosed with chronic urticaria (hives) and pruritus when the scabies treatment did not alleviate his symptoms.

64.     H'Shaka's rash continued despite multiple treatments of prednisone, hydrocortisone, Benadryl, and betamethasone.

65.     H'Shaka was finally re-prescribed Vistaril for his anxiety, which resulted in some of the hives and itching decreasing but with continued feelings of anxiety.

66.     H'Shaka also experiences a range of other psychological symptoms stemming from his isolated confinement, including auditory hallucinations, anxiety disorders, hypersensitivity, and panic attacks.

67.     H'Shaka is terrified that he will be kept in Ad Seg for the rest of his life, causing him acute despair.

68.     H'Shaka experiences life in isolated confinement as a struggle to avoid becoming mentally ill. He is constantly worried that he won't be "here" mentally if he is ever released.

69.     H'Shaka also suffers from severe concentration and memory problems. For years H'Shaka has conducted his own legal work and is a committed reader of books. The concentration and memory problems that have developed over the past few years cause him to forget pages he reads and he notices his attention span and memory deteriorating because of the effects of long term isolated confinement.

70.     These psychological symptoms are precisely those reported in the literature about individuals placed in prolonged solitary confinement. But the extreme duration of H'Shaka's confinement means that the isolative and emotionally numbing effects of solitary confinement have become even more pronounced. H'Shaka's symptoms are almost identical to those described in psychological literature about the long-term effects of severe trauma and torture.

71.     Upon information and belief, it is well known to defendants that numerous prisoners confined in isolated confinement for long periods of time have developed mental illness, and some have committed or attempted suicide while in isolated confinement. All prisoners in isolated confinement have a significant risk of descending into mental illness due to prolonged exposure to those conditions.

72.     In 2007 and 2008, H'Shaka was approved for mental health programming by OMH staff in the Behavioral Health Unit and Group Therapy Programs. However, transfers for these therapeutic programs were denied by "Albany," or DOCCS central office.

73.     Upon information and belief, because of this denial of treatment programs, defendants Waldron, Bosco, and McCulloch have not reconsidered H'Shaka for any therapeutic programs, despite H'Shaka's requests, because any such request would be denied by defendant Bellnier's placement of H'Shaka in Ad Seg.

74.     Because of his overwhelming fear of being returned to a SHU cell and because he was having suicidal thoughts and complaints of severe anxiety, H'Shaka has been placed in a mental health observation cell approximately six times since March, 2013.

75.     Since approximately March 2013, H'Shaka has told OMH staff he felt as if his "mind was melting," walls were closing in around him, he was losing control of his thoughts and mind, an inability to read or relax, and that he could hear voices screaming at him in his cell, among other mental health complaints.

76.     H'Shaka has been observed by OMH staff wringing his hands, unable to sit still, exhibiting pressured speech and appearing irritable, and very agitated.

77.     On more than 10 occasions, OMH staff, under the supervision of defendant Waldron, refused to provide H'Shaka with mental health services because OMH staff, despite the clear evidence to the contrary, professed he was "not objectively showing any anxiety symptoms."  They also claimed that he presented "with a clear agenda to get into a mental health program," despite the fact that severe confinement is a known cause of the very symptoms H'Shaka was exhibiting.

13

78.     During this time, H'Shaka continued to plead for mental health services and/or to be allowed more time out of his cell but was denied.

79.     Despite repeated requests to defendants Waldron and Bosco from H'Shaka, H'Shaka's counsel, and other advocacy organizations during this time, H'Shaka was not provided with mental health services until July, 2015.

80.     H'Shaka's grievances regarding the lack of mental health care were responded to by a designee of defendant Bosco's, stating, in sum and substance, "no mental health services are indicated at this time." Such letters were sent to H'Shaka on March 30, 2015, April 29, 2015, and May 20, 2015.

81.     H'Shaka's counsel wrote to Defendant Bosco on August 5, 2014 regarding H'Shaka's worsening anxiety due to prolonged isolated confinement and was informed by Defendant Bosco's designee via letter dated August 28, 2014, that H'Shaka's mental health assessment did not result in the endorsement of a major anxiety disorder.

82.     A year later, in July 2015, H'Shaka was finally placed on the OMH caseload and prescribed Celexa, but medications have not relieved H'Shaka's anxiety symptoms.

83.     Because of H'Shaka's severe hives that developed in November 2015, H'Shaka was placed back on Vistaril and began taking Prozac, but continued to have anxiety symptoms including difficulties sleeping, racing heart and thoughts, claustrophobia, loss of short term memory, loss of balance, rashes and itching, headaches, and irritability.

84.     Due to continued itching and hives, H'Shaka's Prozac was discontinued and he was then prescribed prednisone and Buspar. These were also discontinued due to continued itching and hives.

14

85.     In February 2016, H'Shaka was prescribed Remeron by OMH staff. This medication was discontinued in July 2016 because it made H'Shaka's mood and energy low, with significant less positivity and lack of motivation.

86.     H'Shaka reports he almost always feels edgy, very fatigued and yet has difficulties falling asleep and staying asleep, has difficulties concentrating, has problems reading and remembering what he has read, and has lost interest in many activities he used to enjoy including exercising and self-guided studying.

87.     H'Shaka lives with constant anxiety and is in fear of another severe anxiety episode.

88.     Mental health staff make weekly rounds in the SHU and Ad Seg unit and ask H'Shaka if he feels like hurting himself. When H'Shaka replies, "no," the staff person continues on his or her rounds without further inquiry.

89.     Until approximately November 2015, there was no offer or opportunity during this brief encounter for a private consultation with a mental health practitioner.

90.     H'Shaka has been told by OMH staff at Clinton, in sum and substance, that "Albany doesn't want you to receive treatment or mental health programs, so our hands are tied." These statements have been witnessed by other prisoners.

91.     The serious mental health impact of even a few years in solitary confinement is well documented, yet mental health care and programming provided to H'Shaka is grossly inadequate.

92.     Defendants are directly responsible for H'Shaka's lack of mental health treatment.

**Initial Assignment to SHU and Ad Seg**

15

93. On August 5, 1991, H'Shaka was committed to the care and custody of DOCCS at the age of 19 years old for second degree murder and criminal possession of a weapon in the second degree.

94. H'Shaka has been held continuously in solitary confinement by DOCCS and defendants since 1996, when H'Shaka was 23 years old.

95. H'Shaka is currently 44 years old, and is eligible for parole release consideration in approximately ten years.

96. On January 30, 1996, H'Shaka was found guilty at a Tier III disciplinary hearing of assault on staff at Coxsackie. The incident occurred on January 14, 1996, when H'Shaka injured two corrections officers with a razor blade at Coxsackie. H'Shaka was sentenced to a total of approximately 18.5 years of solitary confinement in SHU.

97. H'Shaka's SHU time was eventually reduced, through discretionary reviews, administrative appeals, and time cuts to approximately 14 years of SHU time.

98. H'Shaka's injuries from the same incident included three broken fingers, lacerations on his elbow and head, requiring approximately forty staples, a ruptured eardrum, six cracked and broken teeth and a grapefruit-sized testicle.  H'Shaka required plastic surgery to repair the severe damage to his eyes and lips. H'Shaka claims that he acted in self-defense during this incident.

99. H'Shaka was found guilty for assault in the first degree on one of the corrections officers and sentenced in Greene County criminal court on November 24, 1998, to an additional criminal term of 15 years of incarceration. However, the other assault and weapon charges against H'Shaka were dismissed.

100.    On May 15, 1996, H'Shaka was found guilty at a Tier III disciplinary hearing for attempting to kick a correctional officer on April 27, 1996, and sentenced to an additional 150 days confinement in SHU for assault on staff.

101.    On May 10, 1999, H'Shaka was found guilty at another Tier III disciplinary hearing for punching his codefendant in the Greene County courtroom and attempting to run towards the courtroom door. He was sentenced to an additional 36 months of disciplinary confinement in SHU for assault on inmate and attempted escape.

102.    Since the above incidents occurred in 1996 and 1999, H'Shaka has not been charged with any other violent conduct.

103.    The disciplinary record for H'Shaka's past ten years includes:

a.      Possession of two matches on April 6, 2015, resulting in H'Shaka being counseled.

b.      On April 8, 2013, after H'Shaka was returned to the prison from an outside hospital for anxiety-related health problems including rapid heartbeat, vertigo, heart palpitations, inability to walk, chest pains, numbness, uncontrollable shaking, shortness of breath, he refused to leave the infirmary and return to solitary confinement. He was given 60 days of solitary confinement time in SHU for that refusal.

c.      On June 8, 2012, H'Shaka made a comment about a counselor's toes without his shirt on, resulting in 3 months of solitary confinement in SHU.

d.      On January 7, 2008, H'Shaka masturbated in the presence of a social worker, resulting in an additional 90 days of solitary confinement in SHU.

e.      On July 5, 2007, H'Shaka had a positive urinalysis for cannabinoid and opiates, resulting in an additional 90 days of solitary confinement in SHU.

f.      On April 5, 2007, H'Shaka refused to come out of his cell for a cell search. After OMH personnel and his counselor discussed the matter with him, he complied with exiting his cell. No contraband was found, but H'Shaka was given an additional 5 months of solitary confinement in SHU.

g.      On March 22, 2007, H'Shaka was yelling profanities at the nurse during medication rounds. He was given an additional 3 months of solitary confinement in Keeplock.

104.    These types of nonviolent misbehavior reports are not uncommon with prisoners in general population who have mental health or behavioral health issues.

105.    H'Shaka is confined in the same cell type and cell block, regardless of whether he is in SHU for a disciplinary infraction or Ad Seg under indefinite solitary confinement.

106.    While housed in solitary confinement in SHU in Auburn and Upstate, H'Shaka received time cuts from his Keeplock and SHU time for satisfactory and improved behavior on April 30, 2006, December 10, 2007, January 5, 2009, August 13, 2009, and March 9, 2010. In total, H'Shaka received approximately two years of discretionary reductions in his disciplinary solitary confinement time from SHU for good behavior.

107.    On August 11, 2010, H'Shaka received an 18 month reduction in commissary and packages restrictions and 24 months reduction in phone restrictions.

108.    The reasons cited for H'Shaka's time cuts from disciplinary segregation in 2009 and 2010 included "no MBR's [misbehavior reports]" and "Satisfactory" scores with

18

relationships, attitude, and willingness to follow directions with security and counselor staff at Upstate.

109.   While in SHU at Auburn in 2008, H'Shaka was allowed the privilege to be out of his cell without any restraints in order to assist cleaning the SHU shower cells. H'Shaka was provided with a bucket, scrub brush, and plastic gloves. Upon information and belief, this privilege was approved by defendant Bellnier, then Deputy Superintendent of Security at Auburn. There were never any incidents from H'Shaka's lack of restraints or access to other inmates or staff.

110.   With time cuts, H'Shaka was due to be released from SHU solitary confinement on or around November 1, 2010.

111.   On November 30, 2010, an administrative segregation hearing was concluded, placing H'Shaka into administrative segregation. H'Shaka appealed this hearing and filed an Article 78 proceeding in state court challenging the hearing disposition. H'Shaka was kept in administrative segregation during this proceeding.

112.   A new hearing was ordered by the Appellate Division, Third Department on November 1, 2012, because DOCCS denied H'Shaka's right to call witnesses.

113.   The administrative segregation re-hearing ended on December 10, 2012. The recommendation of the Special Investigator was found credible by the Hearing Officer and H'Shaka was again confined in administrative segregation.

114.   The Administrative Segregation Recommendation ("Recommendation") dated November 3, 2010, was re-submitted for H'Shaka's rehearing.

115.   The Recommendation states, in part, that in 1989, when H'Shaka was 17 years old, H'Shaka kicked and punched a staff member at Youth Harlem Valley Secure Facility.

19

116.     H'Shaka denied these allegations and stated that he was assaulted by this staff member, who was well known for assaulting youth who resided at the facility.

117.     A Report by the Office of the State Comptroller in 1998 found that, among other serious violations, the Youth Harlem Valley Secure Facility hired employees with criminal backgrounds to work closely with youth..

118.     The Recommendation further states that H'Shaka has been identified in the past as a member of an unauthorized organization and "continues to be recognized as a major influence in this type of activity."

119.     The only recorded incident of any unauthorized organization activity in H'Shaka's disciplinary history is from nearly twenty years ago in 1997, when rap lyrics or poems were found in H'Shaka's cell with the "C's" crossed out, purportedly signifying rivalry with the "The Crips" gang.

120.     The Recommendation cites to the January 14, 1996, assault on staff and April 12, 1999 assault on H'Shaka's co-defendant as reasons for recommending Ad Seg.

121.     The Recommendation also cites to a November 7, 2005, misbehavior disposition that was reversed and supposed to be expunged from H'Shaka's record, where he was accused of having a twenty dollar bill.

122.     The Recommendation also cites to 17 Unusual Incident (UI) reports connected to H'Shaka.

123.     Eight of those 17 UI reports were supposed to be expunged from H'Shaka's record due to administrative and court reversals of disciplinary hearings, but their expungement was not acknowledged in the Recommendation.

**Periodic Review of H'Shaka's Administrative Segregation Placement**

124.    Once a prisoner is placed in Ad Seg for an indefinite term, he is entitled to periodic "reviews" of his placement. Pursuant to 7 NYCRR 301.4, a prisoner shall have his status reviewed every 60 days by a three-member committee.

125.    By regulation, the reviewers should examine the prisoner's institutional record and write a report setting forth: "(i) reasons why the inmate was initially determined to be appropriate for administrative segregation; (ii) information on the inmate's subsequent behavior and attitude; and (iii) any other factors they believe may favor retaining the inmate in or releasing the inmate from administrative segregation." 7 NYCRR 301.4(d)(1).

126.    After a determination has been made to continue a prisoner in Ad Seg, the prisoner is allowed to submit a written statement regarding the need for continued Ad Seg placement and will be considered during the next scheduled 60 day review. 7 NYCRR 301.4(d)(4).

127.    H'Shaka has not been provided with a copy of his 60 Day Ad Seg review since December 2015, despite his requests to executive staff at Clinton Correctional Facility.

128.    When H'Shaka did receive his 60 Day Review paperwork from defendant Bellnier, it was often received after the following review had already taken place.

129.    These delays and refusals in providing H'Shaka with his 60 Day Reviews denies him the regulatory right and opportunity to contribute to or refute any information contained in the report.

130.    For example, in H'Shaka's May 2015 review, the central office committee commented that "Inmate Hshaka [sic] has not made any complaints, either verbally or in writing during this review period," when in fact H'Shaka was not provided with his previous (March, 2015) 60 day review to comment upon.

21

131.    Defendants Porcelli and DeLisle conducted H'Shaka's May, 2015 review without obtaining defendant Bellnier's March, 2015 review, nor providing the March 2015 review to H'Shaka.

132.    On numerous occasions, the central office review committee and defendant Bellnier do not review H'Shaka's Ad Seg reviews until after the following facility level review has already occurred.

133.    Defendants Porcelli, DeLisle, Randall, and Lucia have on at least one or more occasions not received any feedback or approval from defendant Bellnier to continue H'Shaka's Ad Seg status before commencing another review. Such instances have occurred throughout H'Shaka's Ad Seg confinement:

      a.    H'Shaka's February 22, 2012, review was not signed by defendant Bellnier until April 17, 2012. However, the facility review committee recommended H'Shaka's continued Ad Seg placement on the next Ad Seg review on the same day, April 17, 2012.

      b.    H'Shaka's August 2, 2012, review was not signed by defendant Bellnier until October 2, 2012. However, the facility review committee had already recommended H'Shaka's continued Ad Seg placement on the next Ad Seg review on September 27, 2012.

      c.    H'Shaka's November 10, 2014, review was not signed by defendant Bellnier until January 29, 2015. However, the facility review committee had already recommended H'Shaka's continued Ad Seg placement on the next Ad Seg review on January 9, 2015. The November 2014, review was marked

received in the Clinton Superintendent's office on February 17, 2015, and H'Shaka did not receive his copy until February 19, 2015.

d.      H'Shaka's March 9, 2015, review was not signed by defendant Bellnier until May 18, 2015. However, the facility review committee had already recommended H'Shaka's continued Ad Seg placement on the next Ad Seg review on May 8, 2015. The March, 2015 review was marked received in the Clinton Superintendent's office on May 21, 2015.

e.      H'Shaka's July 8, 2015, review was not signed by defendant Bellnier until September 15, 2015. However, the facility review committee had already recommended H'Shaka's continued Ad Seg placement on the next Ad Seg review on September 8, 2015. The July, 2015 review was marked received in the Clinton Superintendent's office on September 21, 2015.

f.      H'Shaka's September 8, 2015 review was not signed by defendant Bellnier until November 23, 2015. However, the facility review committee had already recommended H'Shaka's continued Ad Seg placement on the next Ad Seg review on November 16, 2015. The September, 2015 review was marked received in the Clinton Superintendent's office on December 1, 2015.

g.      Upon information and belief, all of H'Shaka's 2016 reviews have been submitted by the review committee, but H'Shaka has yet to receive a copy.

134.    Numerous Ad Seg reviews cite to incidents and UI reports which have been ordered expunged from H'Shaka's disciplinary history. For example, the March, 2015 review states that H'Shaka allegedly has 15 UI reports. However, many of them were supposed to be expunged.

23

135.    H'Shaka has objected numerous times in writing since his January, 2011 Ad Seg review to the reference to expunged UI reports in his Ad Seg recommendations.

136.    Defendant Bellnier continues to adopt the central office reviews which references expunged UI reports in his Ad Seg recommendations.

137.    In H'Shaka's July, 2015 review, defendant Bellnier adopted the central office review which stated that there was, "no legal obligation by the department to expunge Unusual Incidents from an inmate's record merely because a disciplinary hearing related to that incident has been expunged by the court."

138.    Because of defendant Bellnier's continued use of expunged incidents, H'Shaka brought a state Article 78 writ of mandamus, granted on September 11, 2015, which ordered DOCCS to expunge eight incidents from H'Shaka's disciplinary history.

139.    Defendant Bellnier, in defiance of the order of expungement, continues to refer to all UI reports, even those expunged, in his Ad Seg determinations.

140.    Upon information and belief, one or more members of the facility level three-member review committee have not been present on at least one occasion when they allegedly decide to continue H'Shaka's Ad Seg confinement, but have simply signed a pre-written and pre-dated recommendation.

141.    Defendants Porcelli, DeLisle, Randall, Lucia, and Bellnier failed to include H'Shaka's completion of ART and ASAT workbook programs in 2010 and 2012 as part of their considerations until H'Shaka's March 2015 review, despite H'Shaka's letters that he had completed those programs.

142.    Defendants Porcelli, DeLisle, Randall, Lucia, and Bellnier have failed to ever acknowledge H'Shaka's religious conversion to Rastafarianism in 2013 or its impact on his improved behavior and relationship to staff.

143.    Defendants' administrative segregation recommendations cite, nearly verbatim in each review, that the reasons for H'Shaka's placement in Ad Seg is because of misbehavior reports for assault on inmate, weapons, demonstration, escape, assault on staff and disruptive behavior.

144.    H'Shaka's disciplinary history shows that his last assault on inmate was in 1999, his last weapons charge was 1996, his last assault on staff was in 1996, and his escape charge was in 1999 when ran towards a courtroom door.

145.    The last disruptive behavior charge against H'Shaka was due to an anxiety attack on April 8, 2013, after which he was placed in mental health observation.

146.    Given the absence of any history of violence for some 18 years, Defendant Bellnier repeatedly referred to this disciplinary infraction on April 8, 2013. In that instance, H'Shaka was charged with disobeying a direct order and a movement violation after returning from an outside hospital for anxiety-related health problems including rapid heartbeat, vertigo, heart palpitations, inability to walk, chest pains, numbness, uncontrollable shaking, shortness of breath. He refused to leave the infirmary and return to solitary confinement. He was placed into mental health observation following the event, but also given 60 days of solitary confinement in SHU.

147.    That incident is referred to in H'Shaka's May 2013, July 2013, September 2013, March 2014, May 2014, September 2014, November 2014, January 2015, and May 2015 reviews

Yet, not a single review mentions the circumstances of that disciplinary incident involving H'Shaka's physical and mental health crisis.

148.   Instead, this April 8, 2013 incident is used by Defendants to demonstrate that H'Shaka is allegedly purposely disobeying staff and must be kept in isolated confinement.

149.   In direct contrast, nearly every single Ad Seg review states that H'Shaka is respectful, continues to be appropriate when dealing with staff and inmates, and has a good rapport with staff.

150.   When H'Shaka has asked defendants Porcelli, DeLisle, Randall, Lucia, and Bellnier as to what he can do to take steps towards being release from Ad Seg, he has been  told, in sum and substance, to continue with his current positive behavior.  Similarly, H'Shaka has been told repeatedly through Ad Seg reviews to continue exhibiting good behavior.

151.   H'Shaka's counsel wrote to defendant Bellnier on August 5, 2014, January 14, 2015, and May 1, 2015, advising him of H'Shaka's worsening anxiety symptoms from being in indefinite isolated confinement. Counsel requested that H'Shaka be considered for alternative placement due to his good behavior and serious mental health needs.

152.   H'Shaka's counsel's letters further requested that H'Shaka be released from Ad Seg or be advised of the process available for being released from indefinite isolated confinement and placed in a less restrictive program or environment.

153.   H'Shaka's counsel also wrote to defendants Porcelli and Randall on August 29, 2014, advising them of H'Shaka's worsening anxiety symptoms from being in indefinite isolated confinement. No response was received.

154.   Defendant Bellnier's designee responded, in sum and substance, that OMH staff make daily rounds and that H'Shaka's placement is appropriate.

26

155.    During the last 13 years in isolated confinement, H'Shaka has never been subjected to any available forms of heightened restricted movement, including, but not limited to, spit masks, cell shields, safety box feed ups, or retention straps. This is because H'Shaka has not been deemed a threat by security personnel in need of further restrictions.

156.    Despite H'Shaka's continued nonviolent behavior, participation in every available incentive or workbook program, defendants Porcelli, DeLisle, Randall, Lucia, and Bellnier have continued to deny H'Shaka release from Ad Seg or placement in any other controlled unit that may provide rehabilitative programming or additional time out of his cell.

157.    H'Shaka has no information about any demonstrable actual path out of Ad Seg and defendants have not informed H'Shaka of any way that he can genuinely hope to seek and gain release from Ad Seg. This denies meaningful review.

158.    Defendant Bellnier's practice, to date not changed by his successor defendant O'Gorman, of denying H'Shaka release despite his positive record operates as a cruel hoax, furthering the hopelessness and despair that H'Shaka experiences in Ad Seg and leads him to reasonably believe that there is no way out of Ad Seg except death.

159.    Defendant Bellnier's continued reliance upon H'Shaka's original crime of commitment and acts committed nearly twenty years ago, and defendants continued reliance upon Unusual Incident reports that were ordered expunged from H'Shaka's disciplinary record by the Director of Special Housing and the Albany County Supreme Court has denied H'Shaka of meaningful review.

160.    Defendants Porcelli, DeLisle, Randall, Lucia, and Bellnier have continued to cite to and describe H'Shaka's original criminal conviction as evidence of his need to remain in administrative segregation, despite the fact that this was explicitly not used in the Administrative

27

Segregation Recommendation, nor was it considered by the Hearing Officer at his December 10, 2012 hearing.

161.    Defendants Porcelli, DeLisle, Randall, Lucia, and Bellnier have repeatedly failed to provide H'Shaka with timely 60 day review reports. This has deprived H'Shaka of an opportunity to dispute any factual evidence or provide information relating to his ongoing isolated confinement and further denies him meaningful review of his Ad Seg placement.

162.    Defendants Porcelli, DeLisle, Randall, Lucia, and Bellnier's refusal to provide any information about a path out of indefinite isolated confinement has further denied H'Shaka meaningful review of his Ad Seg placement.

163.    Since assuming Bellnier's responsibilities in or about September 2017, defendant O'Gorman has failed to remedy the ongoing violations of H'Shaka's rights despite being on notice of them and, on information and belief, has continued Bellnier's practices complained of herein.   In particular, defendants' chronic delays in completing timely reviews have, on information and belief, continued after O'Gorman assumed Bellnier's responsibilities, as more than 90 days have now elapsed since the last review signed by Bellnier was received by plaintiff without any further reviews being provided to him.

**Standards Regarding Torture and Cruel, Inhuman, or Degrading Treatment**

164.    In light of the above well-documented harms, there is an established and growing international consensus that the type of prolonged isolated confinement to which defendants are subjecting H'Shaka violates international human rights norms and civilized standards of humanity and human dignity. International human rights organizations and bodies, including the United Nations, have condemned indefinite and prolonged solitary confinement as a human rights abuse that can amount to torture.

28

165.    The United Nations Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment concluded that the use of solitary confinement is acceptable in only exceptional circumstances, and that its duration must be as short as possible and for a definite term that is properly announced and communicated. The Special Rapporteur further concluded that prolonged solitary confinement is prohibited by the International Covenant on Civil and Political Rights and the Convention Against Torture, and that even 15 days in solitary confinement constitutes a human rights violation.

166.    In 2015, the State of California's correctional department settled a class action lawsuit brought by prisoners who were placed in indefinite solitary confinement (administrative confinement) due to alleged security risks. *Ashker, et al., v. Governor of the State of California, et al.*, 09-CV-05796.

167.    In *Ashker*, the court denied defendants' motion to dismiss, agreeing that plaintiffs adequately pled Eighth and Fourteenth Amendment violations where indefinite confinement without realistic opportunities for release and prolonged isolation without environmental stimuli causes serious psychological pain and suffering and permanent psychological and physical injury.

168.    The *Ashker* settlement agreement includes, among others, Step-Down Programs, Restrictive Custody General Population Units, out of cell recreation and programming for 20 hours per week, and enhanced review processes for any prisoner who has been administratively confined for more than five continuous years.

169.    Defendants and their predecessors, in response to litigation, have entered into settlement agreements increasing SHU-alternative programs, decreasing the length and frequency of disciplinary confinement sentences, and establishing guidelines for the use of

29

solitary confinement for juveniles, and special needs, pregnant and seriously mentally ill prisoners. *See Peoples, et al. v. Fischer, et al.*, 11-CV-2694 *and Disability Advocates, Inc. v. New York State Office of Mental Health*, 02-CV-4002.

170.    The above-referenced previous litigation, in addition to correspondence and grievances regarding H'Shaka's condition, has alerted all defendants to the risks of indefinite isolated confinement as described above.

171.    H'Shaka is suffering the deprivation of basic human needs due to his prolonged isolated confinement, including mental and physical health, physical exercise, sleep, nutrition, normal human contact, meaningful activity, and environmental stimulation.

172.    H'Shaka is suffering significant mental and physical harm.

173.    The source of the harm complained is from defendants' placement and retention of H'Shaka in Ad Seg for a lengthy period of time in conditions of confinement shown to cause serious mental and physical harm.

174.    H'Shaka has exhausted his administrative remedies.


## LEGAL CLAIMS

## FIRST CLAIM FOR RELIEF

**(Against Defendants JAMES O'GORMAN, JOSEPH BELLNIER, MAUREEN BOSCO, DEBORAH MCCULLOCH, JOANNE WALDRON, JOSEPH PORCELLI, KEVIN RANDALL, DAVID LUCIA, JUSTIN DELISLE)**

175.    By their policies and practices described herein, defendants have deprived and continue to deprive H'Shaka of life's necessities, and have violated his basic human dignity and his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

176.    The cumulative effect of extremely prolonged isolated confinement, with the crushing conditions of confinement, constitute a serious deprivation of basic human needs, including but not limited to normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity.

177.    Extremely prolonged exposure to the above described deprivations of basic human needs is currently imposing serious psychological pain and suffering and permanent psychological and physical injury to H'Shaka.

178.    The likelihood that H'Shaka will remain in Ad Seg for the foreseeable future subjects H'Shaka to a significant risk of future debilitating and permanent mental illness and physical harm.

179.    The policies and practices complained of herein have been and continue to be implemented by defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacity.

180.    Defendants are deliberately indifferent to the substantial and obvious risk of harm caused by its policy and practice of keeping H'Shaka in Ad Seg for an extended period of time.

181.    It should be obvious to defendants and to any reasonable person that the conditions imposed on H'Shaka for many years causes tremendous mental anguish, suffering, and pain. Moreover, defendants have repeatedly been made aware, through administrative grievances and written complaints that H'Shaka is currently experiencing significant and lasting physical and psychological injury. Defendants have been deliberately indifferent to H'Shaka's pain and suffering.

## SECOND CLAIM FOR RELIEF

**(Against Defendants JAMES O'GORMAN, JOSEPH BELLNIER, MAUREEN BOSCO, DEBORAH MCCULLOCH, JOANNE WALDRON, JOSEPH PORCELLI, KEVIN RANDALL, DAVID LUCIA, JUSTIN DELISLE)**

182.    Defendants have failed to ensure necessary and appropriate mental health treatment and care, either by personally intervening in H'Shaka's care or by implementing proper systems, policies, and procedures for ensuring appropriate monitoring and management of H'Shaka's care.

183.    Defendants were and continue to be deliberately indifferent to H'Shaka's serious medical needs, in violation of his Eighth and Fourteenth Amendment rights under the United States Constitution.

## THIRD CLAIM FOR RELIEF

**(Against Defendants JAMES O' GORMAN, JOSEPH BELLNIER, JOSEPH PORCELLI, KEVIN RANDALL, DAVID LUCIA, JUSTIN DELISLE)**

184.    Defendants' policy of indefinite and prolonged isolated confinement imposes disproportionate punishment on H'Shaka. Defendants have no legitimate penological interest in retaining H'Shaka indefinitely in the debilitating conditions of Ad Seg without recent, serious disciplinary related infractions.

185.    Defendants' decades-long confinement and infliction of significant psychological and physical harm and the risk of future debilitating harm on H'Shaka, who has not committed any serious infraction for over sixteen years, offends society's sense of decency, constitutes an intolerable practice in modern society, and is a disproportionate punishment which violates the Eighth and Fourteenth Amendments to the United States Constitution.

32

## FOURTH CLAIM FOR RELIEF

**(Against Defendants JAMES O' GORMAN, JOSEPH BELLNIER, JOSEPH PORCELLI, KEVIN RANDALL, DAVID LUCIA, JUSTIN DELISLE)**

186.    Defendants have deprived H'Shaka of a liberty interest without due process of law by denying him from meaningful and timely periodic review of his continued long-term and indefinite detention in Ad Seg, and meaningful notice of what he must do to earn release, in violation of the Fourteenth Amendment to the United States Constitution.

187.    H'Shaka has been held in the crushing conditions described above for over twenty years. This shockingly lengthy confinement is atypical in comparison to the ordinary isolated confinement imposed in New York and other states.

188.    Due to parole and programming requirements, H'Shaka's confinement in Ad Seg precludes him from being released on parole. As a result, H'Shaka will spend a longer time incarcerated in prison than had he not been housed in Ad Seg.

189.    Because indefinite placement in Ad Seg constitutes a significant and atypical hardship, H'Shaka is entitled to meaningful notice of how he may alter his behavior to rejoin general population or be placed in other less restrictive housing, as well as meaningful and timely periodic reviews to determine whether he still warrants detention in Ad Seg.

190.    Defendants have denied and continue to deny any such notice or meaningful review by: (1) failing to provide H'Shaka with notice of what he can do to get released from Ad Seg; (2) providing misleading notice that he can become eligible to be release from Ad Seg by maintaining "positive" behavior, when in fact H'Shaka has maintained positive behavior and is still housed in Ad Seg; (3) making a predetermination that H'Shaka will stay in Ad Seg, thus rendering the periodic reviews procedurally meaningless; and (4) failing to conduct timely

reviews and/or provide him with those reviews, thus precluding him from responding, participating, or providing additional information and from the review committee themselves conducting meaningful review.

191.    Defendants' actions are in violation of the Fourteenth Amendment to the United States Constitution.

## FIFTH CLAIM FOR RELIEF

**(Against Defendants JAMES O'GORMAN, JOSEPH BELLNIER, JOSEPH PORCELLI, KEVIN RANDALL, DAVID LUCIA, JUSTIN DELISLE)**

189.    Defendants have deprived H'Shaka of a protected liberty interest by arbitrarily and capriciously denying H'Shaka release from administrative segregation, but making a predetermination that H'Shaka will stay in administrative segregation and rendering the periodic reviews substantively meaningless. Defendants have acted in violation of the Fourteenth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

**WHEREFORE,** H'Shaka requests that this court:

1.    declare that the acts set forth herein by defendants are in violation of H'Shaka's rights under the Constitution and laws of the United States;

2.    issue injunctive relief ordering defendants (except for defendants Bellnier, Bosco, and Lucia) to ameliorate the conditions under which H'Shaka is held and provide H'Shaka with mental health treatment and/or programming;

3.    enter judgment in favor of H'Shaka for reasonable actual and compensatory, including consequential, damages against each of the defendants, jointly and severally, to compensate H'Shaka for his pain, suffering, and other hardships arising from defendants' deliberate indifference to H'Shaka's serious medical needs and violations of his due process rights;

4.    enter judgment for H'Shaka for reasonable punitive damages against each of the defendants;

5.    award H'Shaka the costs of this action, including reasonable attorneys' fees;

6.    retain jurisdiction of this case until defendants have fully complied with the orders of this Court; and

7.    grant such other and further relief as this court deems just and proper.

DATED:      January 16, 2018

                        By:      s/ Alissa R. Hull
                                    ALISSA R. HULL, Bar No.: 519626
                                    Attorney for Plaintiff
                                    Prisoners' Legal Services of New York
                                    Karen Murtagh, Esq. Executive Director
                                    114 Prospect Street
                                    Ithaca, New York 14850
                                    Telephone: (607) 273-2283
                                    Fax: (607) 272-9122
                                    ahull@plsny.org


                                    STEVEN G. STORCH, Bar No.: 508375
                                    JOHN W. BREWER, Bar No.: 520858
                                    CARA SCHMIDT, Bar No.: 520859
                                    Attorneys for Plaintiff
                                    Storch Amini PC
                                    2 Grand Central Tower
                                    140 East 45th Street, 25th Floor
                                    New York, NY 10017
                                    Telephone: (212) 490-4100
                                    Fax: (212) 490-4208
                                    sstorch@storchamini.com


                                    MICHAEL E. CASSIDY, Bar No.: 601118
                                    Attorney for Plaintiff
                                    Prisoners' Legal Services of New York
                                    Karen Murtagh, Esq. Executive Director
                                    24 Margaret Street, Suite 9
                                    Plattsburgh, New York 12901
                                    Telephone: (518) 561-3088
                                    Fax: (518) 561-3262
                                    mcassidy@plsny.org

36