UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

IMHOTEP H'SHAKA,

                    Plaintiff,

v.                                                          9:17-CV-0108
                                                            (GTS/ATB)
JAMES O'GORMAN, Acting Deputy Commissioner
for Correctional Facilities, Department of Corrections
and Community Supervision; MAUREEN BOSCO,
Former Executive Director, Central New York
Psychiatric Center; DEBORAH McCULLOCH,
Executive Director, Central New York Psychiatric
Center; JOANNE WALDRON, Office of Mental
Health Unit Chief, Clinton Correctional Facility;
JOSEPH J. PORCELLI, Offender Rehabilitation
Coordinator, Clinton Correctional Facility; KEVIN
RANDALL, Sergeant, Clinton Correctional Facility;
DAVID LUCIA, Acting Deputy Superintendent of
Security, Clinton Correctional Facility; JUSTIN
DELISLE, Sergeant, Clinton Correctional Facility; and
JOSEPH BELLNIER, Former Deputy Commissioner
for Correctional Facilities, Department of Corrections
and Community Supervision,

                    Defendants.
_____


APPEARANCES:                                        OF COUNSEL:

PRISONERS' LEGAL SERVICES OF NEW YORK        ALISSA R. HULL, ESQ.
   Counsel for Plaintiff                             MICHAEL E. CASSIDY, ESQ.
114 Prospect Street
Ithaca, NY 14850


AMINI LLC                                           BIJAN AMINI, ESQ.
   Co-Counsel for Plaintiff                          JOHN W. BREWER, ESQ.
2 Grand Central Tower                               STEVEN G. STORCH, ESQ.
140 East 45th Street, 25th Floor
New York, NY 10017

HON. LETITIA JAMES
Attorney General of the State of New York
    Counsel for Defendants
The Capitol
Albany, NY 12224

MATTHEW P. REED, ESQ.
Assistant Attorney General

WILLIAM A. SCOTT, ESQ.
Assistant Attorney General

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this prisoner civil rights action filed by Imhotep H'Shaka

("Plaintiff") against James O'Gorman, Joseph Porcelli, Kevin Randall, David Lucia, Justin

Delisle, and Joseph Bellnier ("DOCCS Defendants), and Maureen Bosco, Deborah McCulloch,

and Joanne Waldron ("OMH Defendants"), is Defendants' motion for summary judgment.  (Dkt.

No. 82.)  For the reasons set forth below, Defendants' motion for summary judgment is granted

in part and denied in part.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Amended Complaint

Generally, Plaintiff's Amended Complaint asserts four claims:[1] (1) cruel and unusual

punishment related to the conditions of his confinement in the form of keeping him in

administrative segregation indefinitely in violation of the Eighth and Fourteenth Amendments

("First Claim"); (2) deliberate indifference to his medical needs and failure to provide adequate

medical care in violation of the Eighth and Fourteenth Amendments ("Second Claim"); (3)

denial of substantive due process through imposition of a disproportionate punishment (i.e.,

---

[1]    Although the Amended Complaint expressly asserts five claims for relief, the Court finds that, even liberally construed, the Amended Complaint's fifth asserted claim for relief is either a procedural due process claim that is redundant of the fourth asserted claim (arising from the same transactions or occurrences) or a substantive due process claim that is redundant of the third asserted claim (arising from the same transactions or occurrences).

continued confinement in administrative segregation despite an extensive recent history of non-violent behavior) that offends society's sense of decency and constitutes an intolerable practice in modern society ("Third Claim"); and (4) denial of procedural due process and meaningful review related to his continued confinement in administrative segregation in violation of the Fourteenth Amendment ("Fourth Claim"). (Dkt. No. 39, at ¶¶ 175-89 [Pl.'s Am. Compl.].)[2]

B.    **Undisputed Material Facts on Defendants' Motion for Summary Judgment**

The following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and either expressly admitted by Plaintiff or denied without appropriate record citations in his response thereto. (*Compare* Dkt. No. 82, Attach. 2 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 94, Attach. 18 [Pl.'s Rule 7.1 Resp.].)

1.    Plaintiff first entered DOCCS custody in 1991 after a conviction for Second Degree Murder and Second Degree Criminal Possession of a Weapon.

2.    Formerly known as Corey Heath, Plaintiff had a history of violence dating back to 1986, when he was just 13 years old.

3.    Before entering DOCCS custody, Plaintiff had received a felony conviction for second degree assault in a Division for Youth facility, and spent time in a local jail for possession of a controlled substance.

4.    Between 1992 and 1995, while in DOCCS custody, Plaintiff received 13 disciplinary tickets.

5.    Plaintiff has accrued 35 disciplinary tickets during his confinement.

---

[2]    Claims One and Two are asserted against all Defendants, while Claims Three and Four are asserted against only the DOCCS Defendants.

6.    On January 14, 1996, Plaintiff was involved in an altercation with two corrections officers at Coxsackie Correctional Facility.

7.    During this incident, Plaintiff obtained a razorblade and used it to slash the forehead of corrections officer Alec Saddlemire, causing arterial bleeding from that area.

8.    Mr. Saddlemire suffered permanent loss of the slashed artery.

9.    Plaintiff also used the razorblade to slash the face of corrections officer Thomas Foley (who had come to the aid of Mr. Saddlemire) several times, with one wound running from Mr. Foley's neck to the top of his head.

10.    Plaintiff was tried in Greene County Court and found guilty of first degree assault on Mr. Saddlemire, resulting in an additional 15-year sentence of confinement.

11.    Plaintiff was also found guilty through DOCCS' internal tier hearing process of assault on both corrections officers and was sentenced to 15 years of disciplinary confinement in the Special Housing Unit ("SHU").  This sentence was eventually reduced to ten years.

12.    Plaintiff's misbehavior did not cease after his 1996 SHU placement.

13.    On April 12, 1999, Plaintiff was in Albany County Supreme Court for a hearing in a civil matter and was allowed to remain uncuffed in the courtroom.

14.    During the hearing, Plaintiff attacked his co-defendant by striking him in the head.

15.    Plaintiff "bolted" for the door of the courtroom in an attempt to escape from custody, but was apprehended and returned to his seat.

16.    Plaintiff verbally threatened the DOCCS sergeant who restrained him, and told the judge, "It doesn't matter what you do, judge[.] I will be back here[.] I will come here again."

17.    Between 1999 and 2010, during the course of disciplinary confinement, Plaintiff

earned ten separate misbehavior reports, including charges of violating direct orders, being under the influence or in possession of alcohol and drugs, harassment, lewd conduct, and interference with employees.

18.     On November 3, 2010, at the conclusion of Plaintiff's disciplinary confinement, a hearing was held to determine whether he should be continued in SHU as an administrative segregation ("Ad Seg") inmate.

19.     At the conclusion of the hearing, it was determined, based upon Plaintiff's serious misconduct both before incarceration and during his confinement as well as his confirmed connection to gang activity, that his presence in the general population of any correctional facility would jeopardize the safe and secure operation of the prison.

20.     Plaintiff appealed his initial placement in Ad Seg and, pursuant to a decision on September 26, 2012, by the New York Appellate Division Third Department, he received a new hearing; at the conclusion of that hearing, he was again placed in Ad Seg.

21.     Since Plaintiff's placement in Ad Seg, he has continued to accrue misbehavior reports for interference, disobeying direct orders, possessing contraband, and making an unauthorized phone call.

22.     During the three-way phone call placed in September 2017 that was the subject of one of these misbehavior reports, Plaintiff asked family members to research Mr. Foley, the victim of his assault on January 14, 1996.

23.     At relevant times between 2013 and 2019, Plaintiff had been confined in the SHU at Clinton Correctional Facility; he was transferred to Attica Correctional Facility in April 2019.

24.     Inmates in SHU typically remain in their cell for 23 hours per day and are allowed

outdoors for one hour of recreation in an individual recreation cell.

25. SHU inmates are offered a minimum of three showers per week, and have the opportunity to earn a fourth shower on Sundays if they have earned privileges under the Progressive Inmate Movement System ("PIMS").

26. SHU inmates who have earned PIMS III status receive one phone call every thirty days, two visits per week, some additional personal property, five dollars ($5.00) in commissary charges, and four showers per week.

27. Plaintiff has been afforded the above privileges.

28. Cleaning supplies are offered to all inmates in SHU.

29. Plaintiff took advantage of the cleaning supplies when offered and keeps his cell neat and tidy at all times.

30. All inmates at Clinton Correctional Facility are housed in single-occupancy cells, whether they are in the general population or in SHU.

31. The cells at Clinton Correctional Facility, and particularly the cell in which Plaintiff was housed, are secured by a door with open bars.

32. The sergeant assigned to the SHU tours the area on a daily basis, conducting "rounds," during which he speaks individually with all of the inmates, addresses concerns the inmates might have, and assesses whether each inmate seems to be coping well with his confinement.

33. In addition to the SHU sergeant's rounds, rounds are conducted by a corrections officer every 30 to 60 minutes, and on a daily basis by a medical nurse, a nurse from the Office of Mental Health ("OMH"), and an OMH counselor.

34.     A facility lieutenant also makes a round of the SHU each day, and the captain, superintendent, deputy superintendent for security ("DSS") and OMH Unit Chief each visit the SHU weekly.

35.     Each of these individuals has interacted with Plaintiff during their rounds of the SHU at Clinton Correctional Facility.

36.     Inmates held in DOCCS facilities are evaluated by OMH personnel and provided mental health services based on a determined mental health service level ("MHSL"), which is assessed on a five-level scale.

37.     An MHSL of 6 indicates that the inmate has no need for mental health services at that time.

38.     An MHSL of 1 indicates that an inmate may have a significant behavioral disorder, or have been discharged from psychiatric inpatient hospitalization in the last six months.

39.     Inmates with an MHSL of 1, 2, 3, or 4 are offered mental health services commensurate with their treatment level.

40.     Their services may differ depending on their housing location within the facility.

41.     Inmates in the SHU at Clinton Correctional Facility who are designated at levels 1, 2, 3, 4, 1S, and 2S (which will be discussed below) are entitled to two primary therapist call-outs per month and a monthly prescriber call-out.

42.     Inmates of the same MHSLs in the general population at Clinton Correctional Facility are entitled to only one therapist call-out per month and a prescriber call-out every three months.

43.     In addition to the numerical MHSL, an inmate may be designated "S," indicating a "serious mental illness," including but not limited to severe personality disorders and schizophrenia. Inmates designated as "S" have an MHSL of 1S or 2S.

44.     These inmates are typically assigned to Special Programs, such as the Intermediate Care Program ("ICP") or the Transitional ICP.

45.     An inmate's housing location determines program availability.

46.     Inmates designated as "S" who are serving time in the SHU beyond 30 days are legally required to participate in a Residential Mental Health Treatment Unit ("RMHTU") for 20 hours per week.

47.     An inmate may be transferred to the Group Therapy Program ("GTP") if there has been a determination that continuing to participate in an RMHTU presents a risk to the safety of inmates or staff.

48.     Clinton Correctional Facility has an on-site GTP available for "S" designated inmates who were unable to function in an RMHTU.

49.     When Plaintiff arrived at Clinton Correctional Facility in April 2013, he had an MHSL designation of 4.

50.     Plaintiff was evaluated by mental health providers at Clinton Correctional Facility and received an MHSL designation of 6, indicating no need for mental health services.

51.     Throughout his incarceration, Plaintiff has primarily been assessed with an MHSL designation of 6.

52.     On June 17, 2015, Plaintiff was screened and his MHSL designation was changed to 3, indicating that, although he was not designated "S," he could benefit from brief

psychotherapy and psychiatric medication.

53.     During his incarceration, Plaintiff was diagnosed with antisocial personality disorder.[3]

54.     Since Plaintiff's MHSL designation was changed, he has been offered one private prescriber appointment and two individual therapy sessions per month.

55.     An individual therapist made daily visits to the SHU, while the Unit Chief made a weekly visit to the SHU.

56.     The Unit Chief does not provide treatment to individual inmates but serves more as an administrator; the Unit Chief is a licensed social worker and was available during her rounds to hear inmate concerns, talk with inmates, and relay her impressions to the inmates' treatment team.

57.     Plaintiff had the ability to address the therapist or the OMH Unit Chief during their visits, if he so desired, and if those rounds were conducted when he was not out of his cell for prescheduled recreation.

58.     Plaintiff's MHSL designation has never been categorized lower than a 3, and he has never been designated as an "S."

59.     The OMH Defendants do not direct the placement of an inmate in any particular type of housing, facility, or program.

---

[3]     The parties appear to dispute whether Plaintiff was diagnosed with this disorder in June 2015 or as early as 2007.  (*Compare* Dkt. No. 82, Attach. 2, at ¶ 54 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 94, Attach. 18, at ¶ 54 [Pl.'s Rule 7.1 Resp.].)  However, because the parties do not dispute that such diagnosis was made at some point at or before the relevant period of this motion, the core of this asserted fact is deemed admitted.  Plaintiff's objection that he disputes the validity of the diagnosis is of no moment to the fact that he was diagnosed as such at some point.

60. On June 28, 2018, as part of the pretrial litigation in this action, Plaintiff was administered the Minnesota Multiphasic Personality Inventory 2 ("MMPI2") by Dr. Jacqueline Bashkoff, Ph.D., a psychologist with 36 years of experience.[4]

61. The MMPI2 is the most widely used personality inventory in the field of psychology.

62. Dr. Bashkoff opined that Plaintiff has a diagnosis of antisocial personality disorder, along with anxiety and depression.[5]

63. During Dr. Bashkoff's three-hour interview of Plaintiff, she assessed his mental health and opined that he did not suffer from a serious mental illness, nor was he psychotic, delusional, or experiencing visual or auditory hallucinations.[6]

64. DOCCS houses approximately 47,000 inmates statewide.

65. Only 19 inmates are designated as Ad Seg prisoners.

---

[4] Plaintiff disputes this asserted fact, arguing that he has not been provided with "backup material" that would enable him to assess whether the test had been accurately administered and scored (i.e., whether the results were valid). (Dkt. No. 94, Attach. 18, at ¶ 62 [Pl.'s Rule 7.1 Resp.].) However, whether the test and its results were valid does not controvert the fact that the test was performed. This fact is therefore deemed to be admitted.

[5] Plaintiff disputes this asserted fact, for the reasons discussed above in note 4. (Dkt. No. 94, Attach. 18, at ¶ 64 [Pl.'s Rule 7.1 Resp.].) However, whether the test was accurately administered and scored and whether Plaintiff's expert has a different opinion as to Plaintiff's diagnoses do not create a dispute as to whether these diagnoses were Dr. Bashkoff's opinion based on her interpretation of the test. This fact is therefore deemed admitted.

[6] Plaintiff disputes this asserted fact, arguing that it was based only on the condition at the time she examined him, that it ignored some of his reported symptoms, and that Plaintiff's own expert disagreed with her assessment. (Dkt. No. 94, Attach. 18, at ¶ 65 [Pl.'s Rule 7.1 Resp.].) However, none of these arguments or Plaintiff's supporting evidence indicate that the asserted fact is not an accurate representation of Dr. Bashkoff's opinion. This fact is therefore deemed admitted.

66.     Inmates are placed into Ad Seg only after a department hearing is held to determine if they fit the criteria to be placed into Ad Seg.

67.     Ad Seg is a status, not a specific location within a prison.

68.     An inmate is placed in Ad Seg if it is determined that his presence in general population would threaten the safety and security of the facility.

69.     The OMH Defendants did not play a role in placing Plaintiff in Ad Seg, nor do they make a recommendation as part of the Ad Seg review process.

70.     Once an inmate is placed in Ad Seg, the appropriateness of continued Ad Seg confinement is assessed through a three-step review process.

71.     Each periodic review begins with a meeting of a facility-level review committee, comprised of a member of the counseling staff, an officer familiar with the inmate being reviewed, and a senior security staff member.

72.     The facility-level review committee discusses the inmate's behavior during the relevant reporting period.

73.     Until July 2017, that review period was every 60 days.

74.     Since that time, a review occurs every seven days for the first 60 days an inmate is in Ad Seg, and then every 30 days thereafter.

75.     The facility-level review committee reviews any documents that the inmate has submitted for consideration.

76.     When making their recommendations, the members of the facility-level review committee consider Plaintiff's initial reason for placement in Ad Seg, his past misconduct, his current behavior, the appropriateness of his interactions with staff, and any other negative or

positive aspects of Plaintiff's behavior.

77. After their discussion, the facility-level review committee makes a recommendation that the inmate be either retained in or released from Ad Seg.

78. Any documents reviewed by the facility-level review committee are forwarded to the Central Office Administrative Segregation Review Committee.[7]

79. The facility-level review committee's recommendation is recorded on a document that contains three sections: (1) the reasons the inmate was initially placed in Ad Seg; (2) subsequent behavior and attitude; and (3) other factors that may favor retaining or releasing the inmate.

80. The first section (describing the reasons an inmate was initially deemed appropriate for Ad Seg) never changes because it is historical information describing the offense or offenses that led to the initial placement in Ad Seg.

81. After considering all of the factors regarding an inmate's past and present behavior, the facility-level review committee makes its recommendation within the third section and signs the document.

82. Defendants Randall, Delisle, Porcelli, and Lucia have served on Plaintiff's

---

[7] Plaintiff denies this asserted fact, arguing that Deputy Superintendent Kelly lacks personal knowledge of whether the documents are forwarded. (Dkt. No. 94, Attach. 18, at ¶ 83 [Pl.'s Rule 7.1 Resp.].) However, Deputy Superintendent Kelly stated in his affidavit that he was previously Director of the Crisis Intervention Unit ("CIU") and that the Director of the CIU was involved in monitoring and evaluating Ad Seg inmates, and that he also served as the chairman of the Central Office Administrative Segregation Review Committee for the periodic Ad Seg reviews. (Dkt. No. 82, Attach. 10, at ¶¶ 5, 8-9 [Kelly Decl.].) The Court therefore finds, for the purposes of this motion, that Deputy Superintendent Kelly's declaration is supported by sufficient personal knowledge to establish the asserted fact. This fact is therefore deemed admitted.

facility-level review committee during his confinement at Clinton Correctional Facility on nine, ten, seventeen, and four occasions, respectively.

83.    On each of those occasions, they have each recommended that Plaintiff remain in Ad Seg based on the fact that they believed he would be a risk to the safety and security of the prison if placed into the general population.

84.    Following the recommendation of the facility-level review committee, the Central Office Administrative Segregation Review Committee ("Central Office Committee") meets in person to evaluate each of the inmates currently held in Ad Seg throughout all DOCCS facilities.

85.    These Central Office Committee meetings are pre-scheduled and not all Ad Seg inmates are necessarily reviewed on the same day.

86.    The three-person Central Office Committee is comprised of the chairman, an attorney representative from the Counsel's Office, and a representative from the Office of Special Investigations.

87.    The only restriction on membership in the Central Office Committee is that the employee who made the initial recommendation for placement in Ad Seg for a particular inmate shall not serve as a member of that inmate's periodic review board, so as to avoid any conflict of interest and/or bias, or the appearance of unfair bias.

88.    No individual member of the Central Office Committee has a greater say in the recommendation than does any other member, regardless of title or position.

89.    During the in-person meeting of the Central Office Committee, the Central Office Committee reviews the written recommendation made by the facility-level review committee, as well as any documents submitted by the inmate.

90. In addition to relying on the written reports, the chairman of the Central Office Committee facilitates a phone conversation with the facility that houses each particular inmate to discuss up-to-the-minute issues, events, and seek explanation and clarification of the recommendations regarding the inmate.

91. Generally, this phone call is with the DSS or a Security Captain at the facility that currently houses the inmate, though not always with the same person.

92. In this phone call, the Central Office Committee and the facility contact discuss factors such as the inmate's medical health, mental health (regardless of whether an inmate is under OMH's care or not), general demeanor with staff and inmates, any change in the inmate's mood, behavior or routine, daily living skills, personal hygiene and cell cleanliness, and what, if any, PIMS privileges are afforded and utilized.

93. Additionally, the Central Office Committee and the facility contact discuss any statements that the inmate has made about being in Ad Seg, letters that the inmate has sent, concerns that the inmate has about being in Ad Seg, and interactions that the facility has noted between the inmate and others.

94. Also discussed is whether the inmate has violated any prison rules.

95. At times, the facilities are asked to reach out to service providers or other DOCCS staff for further information regarding the inmate.

96. Following the discussion with the facility contact and review of all of the associated paperwork, the Central Office Committee makes a recommendation regarding the need for continued Ad Seg placement for each individual inmate.

97. DOCCS is charged with determining whether the individual under consideration

presents a current threat to the safe, secure operation of the facility, and whether and what future threats would be posed by the individual's release from Ad Seg.

98.     The Central Office Committee's recommendation is memorialized in writing, using additional typed pages (where necessary), and sent to the Deputy Commissioner for Correctional Facilities, who makes a final determination.

99.     None of the Defendants in this action served on the Central Office Committee during the relevant time period.

100.    Defendants Randall, Delisle, Porcelli, and Lucia do not have the authority to release Plaintiff from Ad Seg, nor can they create new programs or transfer Plaintiff to another facility.

101.    Defendants Bellnier and O'Gorman served, or are currently serving, as the Deputy Commissioner, tasked with the final determination of Plaintiff's Ad Seg designation for each periodic review.

102.    From November 2011 until his retirement in September 2017, Defendant Bellnier was responsible for the review of Plaintiff's Ad Seg designation.

103.    Defendant Bellnier's personal evaluation of Plaintiff during each of the review periods involved reading and considering the recommendations of each review committee, reviewing any attached correspondences from Plaintiff, and fully assessing Plaintiff's current behavior.

104.    Defendant Bellnier had discussions with the Director of the CIU (who served as the chairman of the Central Office Committee) when necessary.

105.    Both Defendants Bellnier and O'Gorman consider, or considered, all the facets of

Plaintiff's behavior (past and present), the recommendations of each committee, the paperwork submitted by the inmates, and their 33 years of experience working at all levels in a corrections setting.

106.    Both the facility-level review committee and the Central Office Committee have consistently recommended that Plaintiff remain in Ad Seg.

107.    Both Defendants Bellnier and O'Gorman determined that the safety and security of the prison required that Plaintiff remain designated as an Ad Seg inmate and housed in the SHU.

108.    Furthermore, Plaintiff has continued to engage in instances of misconduct even while in Ad Seg.

109.    Any misbehavior in a restrictive environment like the SHU, where privileges are limited and opportunities to misbehave are significantly reduced, is an important factor in evaluating whether an inmate has truly changed for the better and can be trusted in the general population.

110.    In July 2018, a ten-cell unit at Attica Correctional Facility was designated as an alternative location for Ad Seg inmates.

111.    Inmates transferred to this unit at Attica Correctional Facility remain designated as Ad Seg inmates and are still reviewed every 30 days, but are offered out-of-cell programming.

112.    This arrangement provides for more inmate movement and personal interaction with staff and inmates, and allows staff to better assess an inmate's improvement.

113.    Additionally, as with regular Ad Seg confinement, on-site offender rehabilitation coordinators and security staff may make recommendations to grant privileges in accordance

with the PIMS system.

114.     Inmates in Attica Correctional Facility are also eligible to earn privileges that would not otherwise be available to an inmate in Ad Seg or the SHU, such as in-cell television, additional commissary, escorted unrestrained movement, extra phone calls, and congregate recreation.

115.     On April 4, 2019, Plaintiff was transferred to this unit at Attica Correctional Facility where he is eligible to earn the additional privileges and programming previously described should his behavior continue to improve.

116.      Before July 18, 2019, Plaintiff was still classified as an Ad Seg inmate and continued to receive an assessment of his confinement every 30 days.

### D.     Parties' Briefing on Defendants' Motion for Summary Judgment

#### 1.     Defendants' Memorandum of Law

Generally, in their memorandum of law, Defendants assert five arguments.  (Dkt. No. 82, Attach. 1, at 17-35 [Defs.' Mem. of Law].)  First, Defendants argue that Plaintiff's claim relying on a theory of substantive due process must be dismissed to the extent the alleged violations of his rights are encompassed by the Eighth Amendment because those violations must be brought under the more specific constitutional amendment rather than the Due Process Clause. (*Id.* at 17.)

Second, Defendants argue that Plaintiff's claims against the OMH Defendants must be dismissed for two reasons: (a) these Defendants were not personally involved in the alleged violations given that (i) OMH does not play any role in making Ad Seg placement decisions, (ii) Plaintiff has not been designated as having a serious mental illness, (iii) Plaintiff has not

provided any evidence that his given diagnosis is improper, (iv) the OMH Defendants are not the persons who treated him but rather administrators, and (v) Defendants McCulloch and Bosco do not even work at Clinton Correctional Facility and had nothing to do with addressing Plaintiff's mental health complaints; and (b) Plaintiff cannot show that he can meet the requirements of his medical indifference claim because (i) he does not have a sufficiently serious mental condition, (ii) these Defendants did not ignore a serious medical need because they offered him treatment including opportunities to speak with mental health personnel on rounds, two therapist call-outs per month, one prescriber call-out per month, and medications, and (iii) OMH does not have the power to give recommendations for specific placements or to remove him from Ad Seg. (*Id.* at 18-23.)

Third, Defendants argue that the Eighth Amendment claims against the DOCCS Defendants should be dismissed. (*Id.* at 23-27.) As to the objective element of that claim, Defendants argue that (a) courts have generally accepted the restrictions imposed in SHU as not being unconstitutional, (b) Plaintiff has not alleged that he was provided with inadequate food, shelter, or clothing, and there is no evidence that he was denied cleaning supplies for his cell, and (c) Plaintiff's long-term solitary confinement is not cruel and unusual because he has not been denied all outdoor recreation or ability to speak to others at recreation time and because there is a significant legitimate penological interest in keeping him in Ad Seg (i.e., his history of violent behavior and continued misbehavior even while in the SHU). (*Id.* at 24-26.) As to the subjective element of that claim, Defendants argue that (a) Plaintiff's citation to general mental health effects of long-term solitary confinement does not demonstrate that he himself is suffering from such conditions, and, in fact, Plaintiff has not been diagnosed with a serious mental illness, (b)

Plaintiff has been offered mental health treatment and has the ability to interact with various corrections and medical staff on a daily and weekly basis, and (c) Defendants have not acted recklessly in continuing to confine him because that decision is the product of needing to balance the possible mental health impact of his confinement against his dangerousness. (*Id.* at 26-27.)

Fourth, Defendants argue that Plaintiff's claims for violations of his procedural due process rights must be dismissed because he has been provided the level of process required by law. (*Id.* at 27-34.) More specifically, Defendants argue that, although they concede that Plaintiff has established that he has a liberty interest in avoiding lengthy restrictive confinement, the process he received was not constitutionally deficient under *Proctor v. LaClaire*, 846 F.3d 597 (2d Cir. 2017). (*Id.*) In particular, Defendants argue that (a) there is no prohibition in *Proctor* that would prevent Defendants from relying most heavily on Plaintiff's history of violent behavior so long as they also consider and balance that history against his more-recent behavior, (b) their decisions were also based on their experience as corrections officials and an attempt to predict his future behavior in a less-restrictive setting, (c) there is no mandatory time period in which the periodic reviews must be conducted as a constitutional (as opposed to a state or internal DOCCS) requirement, and a violation of any state or DOCCS requirement is not sufficient to sustain a claim pursuant to 42 U.S.C. § 1983, (d) there is no requirement for Defendants to tell Plaintiff exactly what he needs to do to be removed from Ad Seg, and (e) Plaintiff's statements about his confinement are reported to the committees whether or not he provides a written objection to a review notice. (*Id.*) Defendants also note that, in April 2019, Plaintiff was transferred to Attica Correctional Facility, where he has had the opportunity to access more programs and privileges and act in a less-restrictive environment than he previously

could at Clinton Correctional Facility. (*Id.*)

Fifth, Defendants argue that, in the alternative, they are entitled to qualified immunity because it was objectively reasonable for them to believe that they were not violating Plaintiff's constitutional rights and their actions were not contrary to clearly established law. (*Id.* at 34-35.)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in his opposition to Defendants' motion, Plaintiff asserts four arguments. (Dkt. No. 94, Attach. 17, at 17-39 [Pl.'s Opp'n Mem. of Law].) First, Plaintiff argues that Defendants have not shown entitlement to summary judgment on his procedural due process claims because there are significant issues of fact as to whether Defendants complied with the required process. (*Id.* at 17-29.) More specifically, Plaintiff argues as follows: (a) Defendants have continued to use his remote past violent conduct as the dispositive reason for keeping him in Ad Seg without genuinely considering his more-recent good behavior or the fact that a propensity for violence decreases as males age, and they have attempted to justify their predetermined sham reviews with circular logic and prevented him from having the opportunity to prove that he can maintain his good behavior in a less-restrictive environment; (b) even Defendants' expert has stated that Plaintiff should have been moved to a less-restrictive environment sooner, and Defendant Bellnier acknowledged that the only thing preventing a transfer sooner was not Plaintiff's "dangerousness" but Defendant Bellnier's own failure to create or find a suitable alternative placement for him; (c) Defendants' failure to consider his more-recent lengthy period of nonviolent behavior and their delay in creating less-restrictive conditions of confinement are strong circumstantial evidence that the review process is merely a sham with a preordained outcome, and their citation to small pretextual infractions only serve to

reinforce that Defendants are trying to now justify preordained findings; and (d) Plaintiff has never been informed what he would be required to do to be released from Ad Seg, while other Ad Seg inmates with worse behavior have been released before him. (*Id.*)

Second, Plaintiff argues that Defendants have not shown entitlement to summary judgment on the Eighth Amendment conditions-of-confinement claim because there is a genuine dispute of material fact as to whether his continued confinement in Ad Seg is for a legitimate penological purpose, and because there is sufficient evidence showing that he has been exposed to an unreasonable risk of harm as a result of continued confinement in Ad Seg. (*Id.* at 30-32.)

Third, Plaintiff argues that Defendants have not shown entitlement to summary judgment on the Eighth Amendment deliberate indifference claim because (a) the evidence shows that he was not afforded the level of medical care warranted by his mental health and other symptoms despite making Defendants aware of these symptoms, and (b) Defendants acted with deliberate indifference or recklessness and were personally involved in the violations, and the OMH Defendants in particular had a professional responsibility to object to Plaintiff's continued confinement in an environment that they should have known had deleterious health effects. (*Id.* at 33-38.)

Fourth, Plaintiff argues that Defendants are not entitled to qualified immunity because the law was sufficiently clear at the time of the alleged violations for Defendants to have known that their conduct violated Plaintiff's rights. (*Id.* at 38-39.)

### 3. Defendants' Reply Memorandum of Law

Generally, in reply, Defendants assert four arguments. (Dkt. No. 98, Attach. 1, at 5-12 [Defs.' Reply Mem. of Law].) First, Defendants argue that Plaintiff's procedural due process

claims should be dismissed because *Proctor* does not preclude officials from relying on

Plaintiff's past conduct (or in affording more weight to that conduct than on his more-recent

behavior), does not require the creation of definite and clear "goalposts" for removal from Ad

Seg, and does not require DOCCS to create new housing programs for Plaintiff or otherwise

allow him to participate in existing ones. (*Id.* at 5-7.)

Second, Defendants argue that Plaintiff's Eight Amendment conditions of confinement

claim must be dismissed, noting that the same arguments Plaintiff makes here related to the

inherently unhealthy nature of solitary confinement as supported by his expert witness report

were rejected in *Proctor* and should also be rejected here. (*Id.* at 7-8.)

Third, Defendants argue that Plaintiff's Eighth Amendment deliberate indifference claims

must be dismissed for the following reasons: (a) Defendant Waldron did not provide care to

Plaintiff but merely supervised Plaintiff's care providers and thus was not personally involved in

the alleged violation; (b) Defendants Bosco and McCulloch's failure to adhere to agency or

DOCCS procedures or to respond to Plaintiff's complaints does not form the basis for a claim

under 42 U.S.C. § 1983, and there is no evidence that Defendant Bosco ever actually saw those

letters; (c) the OMH Defendants had no authority to have Plaintiff transferred or otherwise taken

out of Ad Seg; and (d) Plaintiff's claim that he should have been afforded different treatment is

essentially a claim of negligence that is insufficient to support a constitutional claim. (*Id.* at 9-

10.)

Fourth, Defendants argue that they are entitled to qualified immunity because the relevant

Second Circuit cases do not constitute clearly established law related to the due process claims,

and, as to the Eighth Amendment claims, lengthy confinement alone has never been recognized

to clearly violate a constitutional right and apparent agreement among health professionals that solitary confinement can have deleterious mental health consequences does not constitute legal notice.  (*Id.* at 10-12.)

## II.    LEGAL STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[8]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).

---

[8]      As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

**III. ANALYSIS**

**A. Whether Defendants Are Entitled to Summary Judgment on Plaintiff's Due Process Claims**

After carefully considering the matter, the Court answers this question in the affirmative as to Plaintiff's Third Claim for substantive due process for the reasons stated in Defendants' memoranda of law (Dkt. No. 82, Attach. 1, at 17 [Defs.' Mem. of Law]; Dkt. No. 98, Attach. 1, at 5 n.2 [Defs.' Reply Mem. of Law]), but in the negative as to Plaintiff's Fourth Claim for procedural due process for the reasons stated in Plaintiff's opposition memorandum of law (Dkt. No. 94, Attach. 17, at 17-29 [Pl.'s Opp'n Mem. of Law]).   To those reasons, the Court adds the following analysis.

**1. Substantive Due Process**

Because of a general reluctance "to expand the concept of substantive due process," "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (internal citations and quotation marks omitted).

The Court finds that Plaintiff's claims of unconstitutional conditions of confinement and deliberate indifference to his medical needs are all encompassed by a more specific constitutional provision–the Eighth Amendment–and, as a result, the Substantive Due Process Clause is not the appropriate vehicle for those claims.  *See Garraway v. Smith*, 12-CV-0924, 2019 WL 2135479, at *5 (W.D.N.Y. May 16, 2019) (noting that the correct amendment for conditions-of-confinement claims for convicted prisoners is the Eighth Amendment, not the Fourteenth

24

Amendment Due Process Clause); *Guzman v. Albany Med. Ctr. Hosp.*, 16-CV-0087, 2016 WL 3823492, at *2 (N.D.N.Y. July 12, 2016) (Sharpe, J.) (finding Fourteenth Amendment substantive due process claim was subsumed by Eighth Amendment deliberate indifference claim); *Felix-Torres v. Graham*, 521 F. Supp. 2d 157, 164 (N.D.N.Y. 2007) (Kahn, J.) ("The Supreme Court has noted that where Eighth Amendment and Fourteenth Amendment due process protections overlap, the [substantive] due process claim will be subsumed by the Eighth Amendment claim as the Eighth Amendment offers greater protection to prisoners."). The Court therefore finds that Plaintiff's Third Claim must be dismissed.[9]

### 2. Procedural Due Process[10]

The Due Process Clause requires, among other things, that prison officials periodically review whether an inmate who is confined in Ad Seg continues to pose a threat to the facility in order to ensure that Ad Seg is not used a pretext to keep the inmate in the SHU indefinitely. *Proctor v. LeClaire*, 846 F.3d 597, 601 (2d Cir. 2017) (citing *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 [1983]). The purpose of periodic reviews "is to ensure that the state's institutional interest justifying the deprivation of the confined inmate's liberty has not grown stale and that prison

---

[9]    The Court notes that Plaintiff, in his opposition memorandum of law, indicated that he "has elected not to pursue" a substantive due process violation as a theory of liability further in this matter, and therefore has essentially consented to dismissal of this claim. (Dkt. No. 94, at 7 n. 2 [Pl.'s Opp'n Mem. of Law].)

[10]    The Court notes that Plaintiff acknowledges that, on July 18, 2019, Defendant O'Gorman, on the recommendation from the Central Office Committee, directed that Plaintiff be released from Ad Seg. (Dkt. No. 94, Attach. 18, at 47.) Plaintiff's release from Ad Seg does not moot his claim for a violation of his right to procedural due process, because he has sought money damages on the basis of the injury that has already occurred as a result of the alleged denial of his due process rights, and he could still be entitled to such damages if successful on this claim. (Dkt. No. 39, at 36 [Pl.'s Am. Compl.].)

officials are not using Ad Seg as a pretext for indefinite confinement of an inmate." *Proctor,* 846

F.3d at 609 (quoting *Hewitt*, 459 U.S. at 476-77 & n.9). The Supreme Court has noted that

prison officials have "wide latitude in the procedures they employ" when Ad Seg is used to

"incapacitate an inmate who 'represents a security threat'" and who remains a security risk

throughout his confinement in Ad Seg. *Proctor,* 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at

476-77 & n.9).

The Second Circuit has identified three criteria that meaningful periodic reviews of

continued Ad Seg confinement must satisfy: (1) the officials must actually evaluate whether the

continued confinement is justified rather than simply go through the procedural motions guided

by a preordained outcome (i.e., regardless of what the evidence shows); (2) the officials must

evaluate whether the justification exists at the time of review or will exist in the future,

considering new evidence related to changes in prison conditions and inmate behavior, although

the officials are not barred from according significant weight to past events; and (3) the officials'

purpose in continuing Ad Seg must be maintaining institutional safety and security or another

valid reason rather than the desire to impose punishment on the inmate. *Proctor*, 846 F.3d at

610-11.

It is important to note that, in assessing whether Defendants have violated Plaintiff's

procedural due process rights, this Court may not review the substance of the decision to confine

Plaintiff in Ad Seg, substitute its judgment for that of Defendants, or rebalance the criteria

required by the DOCCS regulations, but rather must evaluate only "whether Defendants' method

for coming to their Ad Seg determinations is sufficient." *Proctor,* 846 F.3d at 608.

As an initial matter, the Court notes that, although Plaintiff attempts to make much out of

the fact that his reviews appear to have sometimes been conducted with less frequency than every 60 days and without adequate notice for him to submit objections to the reviews (as required by DOCCS policy), such failures to adhere strictly to state or institutional policy are not sufficient to establish a constitutional violation. *See Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (noting that a violation of a state procedural statute alone, without a due process violation, "would not be enough generally to establish a constitutional claim"); *Sanders v. Gifford*, 11-CV-0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014) (report-recommendation of Treece, M.J., adopted by Kahn, J.) ("[E]ven assuming that Defendant Graham deviated from state procedures or DOCCS Directives, a violation of such rules and regulations does not, standing alone give rise to liability under § 1983."); *Ahlers v. Nowicki*, 12-CV-0539, 2014 WL 1056935, at *4 (N.D.N.Y. Mar. 18, 2014) (report-recommendation of Treece, M.J., adopted by Hurd, J.) ("[C]laims involving the improper adherence to proprietary facility policies are incognizable under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983."). Rather, as stated in *Hewitt* and *Proctor*, the Due Process Clause requires that the reviews be conducted only "periodically." The record establishes that the facility-level committee reviews were completed approximately every two months; therefore, the Court finds that there is no issue of fact that these reviews were conducted at least periodically and that they thus satisfy the constitutional requirement in that respect.

Plaintiff suggests that the Second Circuit's conclusions in *Proctor*, a case that shares many general factual similarities with this one, requires that this Court deny Defendants' motion because similar questions of fact are raised in this case. However, *Proctor* appears to have a few notable and material differences from this case. In particular, the Second Circuit in *Proctor*

found a triable factual question about whether the review process provided was constitutionally meaningful based in large part on the defendants' statements suggesting that the outcome of the reviews was preordained, including statements that "the standard DOCCS practice is that an inmate 'never' gets out once he has been placed in [administrative segregation]," that one defendant stated there was nothing Proctor could do to ever be released from administrative segregation and he therefore disregarded evidence of Proctor's more recent behavior as irrelevant, that one defendant believed that Proctor's criminal history alone could support continued confinement, and that one defendant suggested that Proctor would not be released from Ad Seg even if he did everything asked of him (i.e., improved his attitude and behavior for a considerable period of time and accepted responsibility for his past crimes and misconduct). *Proctor,* 846 F.3d at 612-13. Plaintiff has not pointed the Court to any similar statements by the various Defendants in this case that so clearly suggest a pretextual sham process; in fact, Plaintiff acknowledges the absence of such clear statements in his opposition memorandum of law, arguing that this is due to Defendants' learning to "be more circumspect" about their true motivations in the aftermath of *Proctor.* (Dkt. No. 94, Attach. 17, at 18 n.14 [Pl.'s Opp'n Mem. of Law].) However, Plaintiff cites no admissible evidence in support of this argument. Consequently, the Court rejects Plaintiff's argument to the extent he asserts that a comparison with the facts of *Proctor* necessarily requires this Court to deny Defendants' motion for summary judgment. Rather, the Court finds that it is required to more closely consider the specific facts of this case in light of the legal considerations outlined in *Proctor.*

The Court therefore turns to the question of whether the committee reviews themselves (and the surrounding circumstances supported by the evidence) would permit a reasonable fact

finder to determine that Defendants' review process failed to meet the basic standards outlined in *Proctor* as to Plaintiff. Having thoroughly reviewed all of the review documents from November 30, 2010 (when Plaintiff was placed in Ad Seg) to July 11, 2019 (when both the Central Committee and Superintendent recommended Plaintiff be released from Ad Seg), and the totality of the other evidence, the Court finds that there is a genuine dispute of material fact as to whether Defendants' reviews were indeed sufficient to afford due process.

Most troubling to the Court is the first *Proctor* factor (i.e., whether Defendants merely went through the procedural motions guided by a preordained outcome). Based on the current record, a reasonable fact finder could conclude that Defendants used Plaintiff's remote violent conduct prior to being placed in Ad Seg (and his sporadic, relatively minor non-violent incidents while in Ad Seg) as a pretext for their desire to keep him in Ad Seg in order to punish him for past conduct. In particular, the Central Review Committee noted in July and August 2017 that Plaintiff was a strong candidate for transition if he could continue his good communication and behavior, and noted in October 2017 that he had at that time maintained good behavior for more than two years; however, the Central Review Committee offers no explanation as to why the more than two years of good behavior that Plaintiff already displayed was insufficient, or how much longer a period of good behavior would be sufficient. (Dkt. No. 94, Attach. 5, at 171, 173, 175.) Additionally, previous declarations submitted in opposition to Plaintiff's motion for a preliminary injunction state that various DOCCS Defendants had unofficially contemplated the possibility of a less-restricted environment based on Plaintiff's improved behavior, but never made any such formal recommendation in his reviews. (Dkt. No. 29, Attach. 1, at ¶ 39 [Kelly Decl.] ["Based upon his, until recent, consistently improved behavior and appropriate interaction

29

with staff, I foresaw a day when I would recommend some for of lesser restriction."]; Dkt. No. 29, Attach. 3, at ¶¶ 28-29 [Randall Decl.] [stating that he would recommend Plaintiff for placement in a less restrictive environment if Plaintiff demonstrated his ability to act appropriately in such an environment, and that he "believe[d] that day will come"].) Again, it is not clear how much good behavior Plaintiff would have been required to engage in before Defendants would have considered that good behavior sufficient. Although the Court is not convinced that *Proctor* requires the establishment of unambiguously clear and concrete "goalposts," the Court is troubled by the complete absence of any meaningful indication by DOCCS of when and under what circumstances Plaintiff might be released from Ad Seg. The reviews indicate that, at the time of these first indications of the possibility of a transfer to a less-restrictive environment, Plaintiff had received only two misbehavior reports (one in or about May 2015 for which he was counseled and reprimanded, and one in July 2016 for creating a disturbance and disobeying a direct order, for which he appears to have received only a temporary suspension of privileges, not formal discipline) since he had been transferred to Clinton Correctional Facility in April 2013. (Dkt. No. 94, Attach. 5, at 49, 145-47, 171, 173.) Given all the admissible evidence of Defendants' statements and Plaintiff's disciplinary history (particularly from 2013 through 2017), there is a genuine dispute of material fact regarding whether Defendants engaged in a meaningful review of Plaintiff's continued Ad Seg status.

The Court notes that it appears that Defendants began to include more details (including details of more minor misbehaviors, such as acting too familiar with corrections officers during a pat-frisk, cursing at a corrections officer related to his mail, and acting "inappropriately" with a facility nurse) in both the initial and Central Review Committee reviews in the period between

when Plaintiff filed his Complaint in this action in January 2017 and when he was transferred to Attica Correctional Facility in April 2019, at which point there were no further indications of misbehavior. (Dkt. No. 94, Attach. 5, at 160-231.) As discussed above, the declarations (both submitted for the preliminary injunction motion and the current motion) suggest that (1) it was these types of minor incidents that were used to justify Plaintiff's continued retention in Ad Seg during that time (because, as the DOCCS Defendants state, any incident of misbehavior in the controlled environment of Ad Seg and the SHU can be indicative of a propensity to commit worse acts if released to a less-restrictive environment), as well as (2) Defendants believed that it was only the confinements of Ad Seg that prevented Plaintiff from engaging in more-serious offenses. (Dkt. No. 82, Attach. 9, at ¶¶ 20-28 [Randall Decl.]; Dkt. No. 82, Attach. 10, at ¶¶ 36-39 [Kelly Decl.]; Dkt. No. 82, Attach. 12, at ¶¶ 40-45, 52-54 [O'Gorman Decl.].) Based on the fact that these more-detailed reviews with more reports of minor misbehavior (some of which it appears never resulted in any form of formal misbehavior report or disciplinary proceeding) occurred after Plaintiff initiated this lawsuit, and the fact that it does not appear he had any misbehavior after being transferred to Attica Correctional Facility, Plaintiff argues that Defendants' reliance on these minor misbehaviors was a pretextual effort to bolster their preconceived desire to retain him in Ad Seg as punishment for his past violence against corrections officers when faced with Plaintiff's lawsuit. Although this increase in detailed reports would not, by itself, create a genuine dispute of material fact for trial,[11] it strengthens the

---

[11] Without more, temporal proximity between an adverse action (here, the onset of more-detailed reports) and protected speech (here, the filing of the Complaint) is not sufficient to prove a causal connection for the purpose of showing that a proffered reason was pretextual. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). This is especially true here, where Plaintiff has not adduced admissible record evidence establishing that he did not commit

genuine dispute of material fact previously identified by the Court.

Similarly, as discussed above, the Court notes that it does not appear that Defendants considered Plaintiff for a transfer until after he filed his Complaint in January 2017. However, again, the Second Circuit issued its decision in *Proctor* seven days before Plaintiff filed his Complaint in this action; as a result, the belated consideration for a transfer would not, by itself, create a genuine dispute of material fact for trial, although it strengthens the genuine dispute of material fact previously identified by the Court.

For all of the above reasons, the Court denies Defendants' motion for summary judgment on Plaintiff's Fourth Claim for a violation of his procedural due process rights.

**B.      Whether Defendants Are Entitled to Summary Judgment on Plaintiff's Eighth Amendment Claims**

After carefully considering the matter, the Court answers this question in the negative as to Plaintiff's First Claim for unconstitutional conditions of confinement against the DOCCS Defendants, but in the affirmative as to Plaintiff's First Claim against the OMH Defendants and Plaintiff's Second Claim for deliberate indifference to his medical needs against the DOCCS Defendants and the OMH Defendants. The Court reaches these conclusions for the following reasons.

**1.      The DOCCS Defendants**

**a.      Personal Involvement**

As noted above in Part I.B. of this Decision and Order, Defendants Randall, Delisle, Porcelli, and Lucia have all served multiple times on the facility-level review committee that

_____

the misconduct in question, and where the Second Circuit issued its decision in *Procter* seven days before Plaintiff filed his Complaint.

assessed Plaintiff's continued Ad Seg status (and continuously recommended he be retained in Ad Seg), and Defendants Bellnier and O'Gorman conducted the final review of that committee's recommendations to keep Plaintiff in Ad Seg. Plaintiff therefore has established these Defendants' personal involvement in the alleged Eighth Amendment violation related to his conditions of confinement because it is undisputed that all of the DOCCS Defendants were directly involved in the decision to keep Plaintiff in Ad Seg, and the conditions of confinement challenged here are the general Ad Seg/SHU conditions.

However, the Court notes that Plaintiff does not appear to have alleged (much less provided admissible evidence to create a genuine dispute of material fact) that these Defendants were involved in the alleged denial of medical care to him and/or deliberate indifference to his serious medical needs. (*See* Dkt. No. 39, at ¶¶ 9-10, 14-17 [Pl.'s Am. Compl.] [discussing these Defendants' involvement in the context of their role in making the decision to keep him in Ad Seg].) For example, in the Amended Complaint, Plaintiff alleges that, although he was approved for mental health programming by OMH in 2007 and 2008, transfers to those programs were denied by "Albany or DOCCS central office"; he does not allege the DOCCS Defendants specifically were involved in those denials. (Dkt. No. 39, at ¶ 72 [Pl.'s Am. Compl.].) Any argument that his placement and retention in Ad Seg was, by itself, in effect an inherent denial of adequate medical care as a general matter is not persuasive because, as will be discussed below in Part III.B.2. of this Decision and Order, Plaintiff was provided relevant medical care while in Ad Seg.

The sole basis of personal involvement by Defendant Bellnier is Plaintiff's allegation that his counsel sent letters to Defendant Bellnier in August 2014, January 2015, and May 2015, in

which he advised Defendant Bellnier of Plaintiff's "worsening anxiety symptoms from being in indefinite isolated confinement," to which Defendant's Bellnier's "designee" responded "that OMH staff make daily rounds and that [Plaintiff's] placement is appropriate." (Dkt. No. 39, at ¶ 151, 154 [Pl.'s Am. Compl.].) As an initial matter, mere factual allegations are insufficient to successfully oppose a motion for summary judgment. In any event, these letters, assuming that Defendant Bellnier in fact saw and read them (an assumption for which Plaintiff has pointed to no supporting evidence), do not constitute a basis for reasonably finding that Defendant Bellnier was personally involved in the alleged denial of adequate medical care. *See Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing cases); *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (noting that courts generally find that merely writing a letter of complaint does not suffice to show personal involvement where the official merely receives a letter and passes it onto a subordinate for response or investigation); *accord, Wingate v. Gives*, 05-CV-1872, 2009 WL 424359, at *7 n.4 (S.D.N.Y. Feb. 13, 2009). Given the lack of factual allegations and admissible record evidence that any of the DOCCS Defendants were personally involved in decisions related to the level of mental health care that Plaintiff received while in Ad Seg, Plaintiff cannot show that these Defendants were personally involved in the alleged deliberate indifference to his serious medical needs under the Eighth Amendment. As a result, Plaintiff's Eighth Amendment claim for deliberate indifference to his

serious medical needs is dismissed as against the DOCCS Defendants.[12]

Based on the above, the Court must assess whether the actions of the DOCCS Defendants resulted in conditions of confinement that violated the Eighth Amendment.

### b.     Conditions of Confinement

A plaintiff asserting an Eighth Amendment claim related to the conditions of his confinement must satisfy both objective and subjective tests: (1) to satisfy the objective test, "a plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs" such that the conditions "pose an unreasonable risk of serious damage to his health"; and (2) to satisfy the subjective test, "a plaintiff must demonstrate that the defendants imposed the conditions with deliberate indifference," meaning that the defendants knew of, and disregarded, "an excessive risk to the plaintiff's health or safety."  *Rasheen v. Adner*, 356 F. Supp. 3d 222, 240 (N.D.N.Y. 2019) (Hurd, J.) (quoting *Walker v. Schult*, 717 F.3d 119, 125 [2d Cir. 2013]; *Jolly v. Coughlin*, 76 F.3d 468, 480 [2d Cir. 1996]).

As to the objective element, in his Amended Complaint, Plaintiff alleges that he has been subjected to "extreme isolation, sensory deprivation, and restricted movement," and "an absolute denial of work, cultural, and social opportunities, severely limited recreational and religious opportunities, limited access to personal property, extraordinary levels of surveillance and control, and limited contact with family and loved ones."  (Dkt. No. 39, at ¶¶ 18-19 [Pl.'s Am.

---

[12]     The Court notes that, in the alternative, even if any of the DOCCS Defendants were personally involved in a denial of medical care, Plaintiff has failed to establish entitlement to relief on the merits of that claim, as will be discussed below in Part III.B.2.b. of this Decision and Order.

Compl.].)  More specifically, he alleges, in part, that has had no access to group activities (including group mental health programs), he has been housed in a single-occupancy cell from which the only way he can communicate with other prisoners is by yelling (for which he can be punished by corrections officers), he has been subjected to the noise of other mentally ill prisoners yelling and making loud noises for long periods during both day and night, there have been weeks or months when he has not been provided with cleaning materials for his cell, his cell has been nine-by-eleven feet in size with no internal window, he has received only one radio and one (audio-only) television station in his cell, he has been allowed only one or two hours per day outside of his cell in a nine-by-eleven-foot chain-link exercise pen that does not have a solid roof to protect him from inclement weather, he has had no access to recreational, educational or vocational programs, and he has been allowed a five-minute shower three times per week.  (*Id.* at ¶¶ 20-36.)  In sum, Plaintiff alleges that he has been deprived of basic human needs of "normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity" as a result of the conditions in Ad Seg.  (*Id.* at ¶¶ 175-77.)

As an initial matter, the Court notes that the conditions Plaintiff alleged are typical conditions of SHU or Ad Seg, which the Second Circuit and other courts in this Circuit have repeatedly upheld to be constitutional.  *See Smith v. Annucci*, 18-CV-6261, 2019 WL 539935, at *6 (W.D.N.Y. Feb. 11, 2019) ("Courts in this Circuit have held that as a general rule, administrative segregation conditions, even though restrictive and harsh, are insufficient to establish Eighth Amendment violations because they are part of the penalty that criminal offenders pay for their offenses against society."); *Zimmerman v. Todd*, 15-CV-1437, 2018 WL

4691254, at *8 (N.D.N.Y. Aug. 30, 2018) (Peebles, M.J.) ("Generally speaking, confinement in a DOCCS facility's SHU under ordinary conditions does not rule afoul of the Eighth Amendment's prohibition of cruel and unusual punishment."), *adopted by* 2018 WL 4689105 (N.D.N.Y. Sept. 28, 2018) (Kahn, J.); *Booker v. Maly*, 12-CV-0246, 2014 WL 1289579, at *16-17 (N.D.N.Y. Mar. 31, 2014) (report-recommendation by Baxter, M.J., adopted by Mordue, J.) ("Restrictive SHU conditions on their own do not per se rise to the level of cruel and unusual punishment."). Plaintiff has not provided any admissible evidence that his conditions of confinement went beyond these typical conditions. Additionally, the admissible evidence strongly contradicts his more-recent assertions that he was almost completely socially isolated; rather, Plaintiff has reported to multiple sources (and has testified in his own deposition) that he took advantage of opportunities to speak with various corrections officers on their rounds, with OMH staff, and with other inmates. (*See, e.g.*, Dkt. No. 82, Attach. 3, at 97-98, 104-05, 109-11, 138-39, 143, 177-81, 346, 470-71); Dkt. No. 94, Attach. 2, at ¶¶ 46-50 [Pl.'s Decl.]; Dkt. No. 94, Attach. 4, at ¶ 10 [Grassian Decl.]; Dkt. No. 94, Attach. 4, at 17-23.) Based on the evidence, the Court cannot say that Plaintiff can show that he suffered a *per se* deprivation of any basic human need as a result of the Ad Seg conditions.

However, the specific facts of this case require further analysis. Plaintiff acknowledges that "solitary confinement" is not, by itself, constitutionally impermissible, but argues that the *length of time* he was kept first in disciplinary confinement and then in Ad Seg goes beyond the bounds of the Eighth Amendment. (Dkt. No. 94, Attach. 17, at 31-32 [Pl.'s Opp'n Mem. of Law].) The Second Circuit has indeed recognized that "whether incarceration in the SHU violates the Eighth Amendment . . . depends on [both] the duration and conditions of the

confinement." *Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015); *see also Hutto v. Finney*, 437 U.S. 678, 685 (1978) (noting that "the length of confinement cannot be ignored in deciding whether the [overall conditions of] confinement meet [ ] constitutional standards").

Plaintiff has been in Ad Seg since November 30, 2010, and was directed to be released from Ad Seg on July 18, 2019, for a total of eight years, seven months, and 18 days.  (Dkt. No. 94, Attach. 18, at 47.)  Plaintiff correctly notes, however, that he has been subject to the offending conditions since 1996 (when he was first placed in the SHU for disciplinary reasons), for a total of approximately 23 years.[13]  (Dkt. No. 94, Attach. 17, at 32 n.25 [Pl.'s Opp'n Mem. of Law].)

Thus, Plaintiff had been subjected to the conditions of SHU/Ad Seg for approximately 23 years, despite the fact that he had only two apparent relatively minor misbehavior reports between May 2013 (when he was transferred to Clinton Correctional Facility) and January 2017 (when he filed his Complaint), as well as a few other instances of non-violent misconduct (e.g., acting too familiar with corrections officers, swearing at a corrections officer, engaging in a three-way call in violation of prison rules) thereafter.  Other courts have found that continued confinement in conditions similar to those in the SHU for periods of 20 years or more that is based on past violent conduct, and that fails to take into account a lack of more-recent serious disciplinary infractions over a lengthy period of time, suggests a violation of the Eighth Amendment.  *See Reynolds v. Arnone*, 402 F. Supp. 3d 3, 18-20 (D. Conn. 2019) (finding that

---

[13]    It is undisputed that Plaintiff was sentenced to 15 years of disciplinary confinement in the SHU as a result of his attack on two corrections officers in January 1996, which was eventually reduced to 10 years, and that he continued to engage in misbehavior while in disciplinary confinement.

conditions similar to those in SHU, including limited abilities for meaningful social interaction, constituted a deprivation of basic needs in the context of a life-sentence inmate where he had already spent 23 years in such conditions); *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 777-78 (M.D. Pa 2016) (granting preliminary injunction where plaintiff had been discipline-free for the most recent 25 years of his 36-year period of solitary confinement, yet defendants continued to justify that confinement based on his remote history of assaults and escape attempts); *Shoatz v. Wetzel*, 13-CV-0657, 2016 WL 595337, at *8 (W.D. Pa Feb. 12, 2016) (denying motion for summary judgment because there was sufficient evidence for a reasonable fact finder to determine that the cumulative effect of over 22 years in consecutive solitary confinement resulting in mental health problems constituted a sufficiently serious deprivation of at least one basic human need); *Wilkerson v. Stadler*, 639 F. Supp. 2d 654, 681-82 (M.D. La 2007) (concluding that plaintiff adduced sufficient evidence such that a reasonable factfinder could determine that there was no legitimate penological basis for keeping plaintiffs in lockdown for 28 and 35 years based on the murder of a prison guard where plaintiffs introduced evidence that they had not had any serious disciplinary infractions "for decades").  There is no dispute that Plaintiff has been subjected to SHU conditions for a significant amount of time, one that is comparable to the above cases, or that he has not engaged in the type of violent behaviors that initially justified his placement in the SHU since he was reclassified to Ad Seg in 2010.  Given the length of time Plaintiff has been living in SHU conditions and his behavior history since 2013 in particular, the Court finds that there is a genuine question of material fact regarding whether Plaintiff was deprived of at least one basic human need as a result of the long duration of his confinement in a manner that violates the Eighth Amendment (in particular, the need for social contact or

environmental/sensory stimulation through the lack of ability to access recreational, educational, and other programs to fill his spare time). *See G.H. by and through Henry v. Marstiller*, 19-CV-0431, 2019 WL 6694738, at *4 (N.D. Fla. Dec. 6, 2019) ("Courts have recognized exercise, social interaction, environmental stimulation, and sanitation as basic human needs."); *Reynolds*, 402 F. Supp. 3d at 18-20 (finding that conditions similar to those in SHU, including limited abilities for meaningful social interaction, constituted a deprivation of basic needs when considering the duration of his incarceration); *Johnson*, 209 F. Supp. 3d at 777 ("A number of courts have resolved that the denials of basic human needs such as social interaction, environmental stimuli, exercise, and sleep which attend long-term isolation run afoul of the Eighth Amendment.").

As to the subjective element, the Supreme Court has noted that conditions satisfying the Eighth Amendment standard include "those that are totally without penological justification." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002). As discussed above related to Plaintiff's procedural due process claim, there is a genuine dispute of material fact regarding whether the DOCCS Defendants were relying solely on Plaintiff's past conduct (in particular his assault on two corrections officers and his attempted escape during a court appearance) when deciding to retain him in Ad Seg. As a result, there is also a genuine dispute of material fact as to whether the DOCCS Defendants had a legitimate penological justification for retaining Plaintiff in Ad Seg for the purposes of the Eighth Amendment. *See Smith v. Annucci*, 18-CV-6261, 2019 WL 539935, at *6 (W.D.N.Y. Feb. 11, 2019) (declining to dismiss plaintiff conditions-of-confinement claim related to being subjected to solitary confinement conditions for 22 years due to the existence of questions of fact about whether the defendant had provided constitutionally

adequate review of his Ad Seg status).  In other words, even if Plaintiff's past violent behavior

provides a possible penological justification, there is a point at which circumstances (i.e., the

amount of time in Ad Seg and the inmate's behavior during that time) reasonably suggest that

such justification is no longer legitimate.  Whether or not Defendants have shown a sufficient

penological justification relies on outstanding questions of fact that a jury must decide.  *See*

*Wilkerson*, 639 F. Supp. 2d at 668-69 (accepting plaintiff's argument that defendants had no

legitimate penological interest in continuing to keep them in solitary confinement for the

purposes of the Eighth Amendment, and rejecting defendants' generic assertion that the need for

facility safety provided a legitimate penological interest under the circumstances).

Lastly, the requisite deliberate indifference can also sometimes be inferred "from the fact

that the risk of harm is obvious."  *Hope*, 536 U.S. at 738.  It is no secret that the effects of long-

term solitary or restricted confinement have a detrimental effect on mental health; that fact has

been recognized by numerous courts that have considered the issue.  *See Davis v. Ayala*, 135

S.Ct. 2187, 2210 (2015) ("But research still confirms what this Court suggested over a century

ago: Years on end of near-total isolation exact a terrible price," including common side effect of

anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors);

*United States v. D.W.*, 198 F. Supp. 3d 18, 93-94 (E.D.N.Y. 2016) (noting that experts have

classified solitary confinement as "a form of social death," and discussing the recognized mental

effects of "post-SHU syndrome"); *Peoples v. Annucci*, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016)

(noting that "[t]he consequences of long-term solitary confinement are so well-known that

numerous medical associations, including the American Psychiatric Association, the American

Public Health Association, the National Alliance on Mental Illness, the Society of Correctional

Physicians, and Mental Health America, have all issued formal policy statements opposing the practice"); *see also Reynolds*, 402 F. Supp. 3d, at 18-20 (discussing medical research about the effect of social isolation on mental health in the context of restrictive conditions imposed on death row and life-sentence inmates). Here, Plaintiff has offered evidence from a medical source discussing the effects of long-term confinement both generally and on him specifically. (Dkt. No. 94, Attach. 4, at 8-40.) Granted, it is undisputed that Plaintiff was provided medical care and had at least some social contact during his "solitary" confinement (during which he continued to commit some acts of misbehavior). However, under the circumstances, the Court finds that summary judgment is also inappropriate as to this element.[14]

### 2.  The OMH Defendants

#### a.  Personal Involvement

Generally, according to Plaintiff's allegations in the Amended Complaint, (a) Defendant Bosco is the former Executive Director of the Central New York Psychiatric Center (a facility operated by OMH), was in charge of all mental health services provided to DOCCS prisoners, and directly denied Plaintiff's grievance requesting mental health treatment, (b) Defendant McCulloch is the current Executive Director of the Central New York Psychiatric Center and is

---

[14]    The Court rejects Defendants' argument in their reply memorandum of law that it should dismiss Plaintiff's Eighth Amendment conditions-of-confinement claim because similar claims were dismissed in *Proctor* on remand from the Second Circuit. (Dkt. No. 98, Attach. 1, at 7-8 [Defs.' Reply Mem. of Law].) Although the factual circumstances of *Proctor* are somewhat similar to those in this action, they are not identical, and the Court is not convinced that they are similar enough that a different outcome could not result in this case, particularly given that Mr. Proctor's past violent behavior was arguably more extreme than was Plaintiff's, a factor which goes to the existence of a legitimate penological justification. *See Proctor*, 846 F.3d at 603 (noting multiple escape attempts [one of which, from a maximum security facility, was briefly successful], soliciting a firebomb on a residence, setting fire to his cell twice, stabbing another inmate, fighting, harassment, and other violent conduct).

in charge of all mental health services provided to DOCCS prisoners, and (c) Defendant Waldron is the OMH Unit Chief at Clinton Correctional Facility and directly denied Plaintiff's request for mental health treatment per her supervision of OMH staff.  (Dkt. No. 39, at ¶¶ 11-13, 77 [Pl.'s Am. Compl.].)  In his opposition memorandum of law, Plaintiff argues as follows: (a) Defendant Waldron ignored his mental health symptoms by (i) continuously approving his designation as MHSL 6 until June 2015 despite the fact that he spent 10 days under observation or suicide watch in 2013 and despite his other reports of mental health symptoms made to OMH staff, and (ii) ignoring and failing to respond to letters from Plaintiff and legal organizations about his mental health symptoms and lack of adequate care in violation of DOCCS policies; and (b) Defendants Bosco and McCulloch received complaint appeals from Plaintiff about the inadequacy of his mental health care but failed to conduct an investigation in order to respond, and failed to conduct a proper review of his appeals, which are both required by applicable psychiatric center or DOCCS policies  (Dkt. No. 94, Attach. 17, at 33-37 [Pl.'s Opp'n Mem. of Law].).  Plaintiff also generally argues that the OMH Defendants, as mental health professionals, were professionally obligated to speak out against conditions or treatment that they should have known were unacceptable, even though they did not have any power to alter DOCCS' placement decisions.  (*Id.* at 38.)  As a result, Plaintiff argues that Defendant Waldron is liable by virtue of both her failure to adequately supervise her subordinates and her failure to remedy constitutional violations of which she was made aware through letters, and that Defendants Bosco and McCulloch are liable by virtue of their failure to remedy constitutional violations of which they were made aware through Plaintiff's grievances and letters.

As to Plaintiff's claim related to his conditions of confinement, it is undisputed that the

OMH Defendants did not have any power or authority to alter Plaintiff's designation as an Ad Seg inmate or otherwise alter his placement or privileges at Clinton Correctional Facility or any other DOCCS facility. Given this fact and the fact that Plaintiff's Eighth Amendment claim related to his conditions of confinement is premised on the conditions imposed as a result of being designated in Ad Seg (with its consequent lack of human interaction, out-of-cell time, and other various privileges afforded to inmates in the general population), the Court can conceive of no way in which a reasonable factfinder could conclude that the OMH Defendants were personally involved in the continued conditions that Plaintiff alleges were unconstitutional. Plaintiff's argument that the OMH Defendants were essentially obligated to petition DOCCS on his behalf based on their status as mental health providers because they should have known that long-term solitary confinement is mentally harmful is irrelevant to the question of whether they were personally involved in instituting or continuing the alleged conditions of confinement; Plaintiff points to no legal authority for the point of law that violating a professional ethical obligation to report harmful conditions constitutes a sufficient basis, in and of itself, to constitute personal involvement, especially where the individual has no authority to alter the harmful condition. As a result, the Court finds that Plaintiff's Eight Amendment claims for inadequate conditions of confinement against the OMH Defendants must be dismissed for lack of personal involvement.

As to Plaintiff's claims of deliberate indifference to his serious medical needs, to establish personal involvement in that alleged deliberate indifference, Plaintiff must show that the OMH Defendants (1) directly participated in the violation, (2) failed to remedy a wrong after being informed through a report or appeal, (3) created a policy or custom that sanctioned conduct

amounting to a constitutional violation, or allowing such a policy or custom to continue, (4)

engaged in grossly negligent supervision of subordinates who committed a violation, or (5)

exhibited deliberate indifference in failing to act on information that unconstitutional acts were

occurring. *Brandon v. Kinter*, 938 F.3d 21, 36-37 (2d Cir. 2019).

### i. Defendant Waldron

As to Plaintiff's argument that Defendant Waldron was personally involved in the alleged

denial of adequate medical care through refusing to change his MHSL designation between his

transfer to Clinton Correctional Facility in April 2013 and June 2015, the current record contains

admissible record evidence from which a reasonable factfinder could conclude that Defendant

Waldron had the authority to determine Plaintiff's MHSL designation (and thus to determine

what extent of mental health services he was entitled to receive) and had some awareness of

Plaintiff's medical complaints during that relevant period before Plaintiff's MHSL was

reclassified. As a result, the Court finds that Defendant Waldron was personally involved in the

alleged denial of adequate medical care in this respect.

As to Plaintiff's argument that Defendant Waldron was personally involved in the alleged

denial of adequate medical care through ignoring his letters that contained his reported

symptoms, Plaintiff cites to the following documents: (1) a letter of August 5, 2014, from

Prisoners' Legal Services of New York discussing Plaintiff's reported anxiety and panic

symptoms, discussing the health effects of long-term solitary confinement, and requesting more

mental health programming for Plaintiff; (2) a grievance from January 21, 2015, in which he

discussed his mental health symptoms and requested release from the SHU and placement in a

therapeutic program that he states was forwarded to Defendant Waldron as the OMH Unit Chief;

(3) a letter from January 27, 2015, addressed to the Unit Chief requesting programming; and (4) a grievance from February 18, 2015 (which was referred to Defendant Waldron) again relating to Plaintiff's reported mental health concerns. (Dkt. No. 94, Attach. 17, at 34 [Pl.'s Opp'n Mem. of Law]; Dkt. No. 94, Attach. 5, at 501-02, 504; Dkt. No. 94, Attach. 16, at 207-09.) A letter from Defendant Waldron to Plaintiff dated February 13, 2015, indicates that Defendant Waldron responded to Plaintiff's requests by stating, "You have been screened several times for mental health services and determined not to require services at this time." (Dkt. No. 94, Attach. 5, at 506.) All of these letters are from the period before his MHSL was changed. As a result, it does not appear that Plaintiff has asserted any specific way in which Defendant Waldron was personally involved in the alleged denial of adequate medical care after June 2015 other than the fact that she was supervising OMH staff.

However, notwithstanding Plaintiff's failure to make such an argument, the Court recognizes that notes from the Case Management Committee meetings related to Plaintiff's OMH care from July 9, 2015, to September 14, 2017, indicate that Defendant Waldron was not only a participant of those meetings, but also one of the Co-Chairs of the Committee. (Dkt. No. 94, Attach. 16, at 85-194.) These records reflect that Defendant Waldron played an active role in determining the course of Plaintiff's treatment (even if she was not physically providing that treatment); thus, contrary to Defendants' argument, Defendant Waldron did not merely supervise individuals who committed constitutional violations, but rather she was directly involved in the course of Plaintiff's treatment. As a result, the Court finds that the record sufficiently establishes that Defendant Waldron was personally involved in the alleged Eighth Amendment violation.

### ii.      Defendants Bosco and McCulloch

As an initial matter, the Court notes that, unlike Defendant Waldron, Plaintiff does not even allege that Defendants Bosco and McCulloch participated in the determination of what treatment Plaintiff received.  As a result, Plaintiff must allege that (a) they had actual or constructive knowledge of the unconstitutional practices, and (b) they demonstrated gross negligence or deliberate indifference in failing to act.  *Merriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989).

As to Plaintiff's argument that Defendants Bosco and McCulloch are liable based on the fact they received his letters and/or grievances and were thus aware of alleged constitutional violations but failed to act to remedy them, the Court notes that Plaintiff's argument is based on the following documents: (1) a letter of May 23, 2013, to Defendant Bosco discussing his reported mental health symptoms and his belief that he was not getting sufficient mental health medication or treatment (which was forwarded to Defendant Waldron for investigation); (2) the letter of August 11, 2014, to Defendant Bosco from Prisoners' Legal Services that was discussed above related to Defendant Waldron; (3) a letter of February 18, 2015, to Defendant Bosco in which he discusses his reported symptoms and requests mental health services (which was forwarded to Defendant Waldron for investigation); and (4) a letter of July 18, 2016, to Defendant McCulloch for the purposes of appealing a denial of his previous grievance handled by someone else in Risk Management.  (Dkt. No. 82, Attach. 7, at 12-14; Dkt. No. 94, Attach. 18, at ¶ 82; Dkt. No. 94, Attach. 16, at 201-09.)

The record, which shows that Defendant Bosco forwarded Plaintiff's 2013 and 2015 letters to Defendant Waldron for investigation, does not support Plaintiff's argument that

Defendant Bosco somehow "shirked her responsibilities," nor does it indicate that Defendant Bosco was personally involved in the alleged denial of treatment. "Courts have consistently held that, if an official received a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter." *Outman v. Waldron*, 14-CV-0540, 2016 WL 1175235, at *1 (N.D.N.Y. Mar. 24, 2016) (McAvoy, J.) (quoting *Lloyd v. City of New York*, 43 F. Supp. 3d 254, 268 [S.D.N.Y. 2014]); *McFadden v. Friedman*, 12-CV-0685, 2015 WL 5603433, at *18 (N.D.N.Y. Sept. 23, 2015) (report-recommendation by Hummel, M.J., adopted by Suddaby, J.) (finding no personal involvement where the defendant merely delegated investigation to subordinate staff); *Guillory v. Ellis*, 11-CV-0600, 2014 WL 4365274, at *21 (N.D.N.Y. Aug. 29, 2014) (report-recommendation by Baxter, M.J., adopted by D'Agostino, J.) (finding that, "[i]n order for a letter to suffice to establish personal involvement, plaintiff would have to show that the supervisor conducted a personal investigation or personally took action on the letter or grievance," but "personal action does not include referring the letter to a subordinate for investigation"). Therefore, Defendant Bosco's forwarding of the 2013 and 2015 letters to Defendant Waldron for investigation does not establish personal involvement.

Additionally, to the extent that Plaintiff argues that Defendants Bosco and/or McCulloch were personally involved based on a failure to conduct an investigation or a proper review of his appeals related to his reports of inadequate treatment, any failure by Defendant Bosco to respond to the August 2014 letter does not constitute personal involvement. *See Johnson v. McKay*, 14-CV-0803, 2015 WL 1735102, at *9 (N.D.N.Y. Apr. 16, 2015) (report-recommendation by Dancks, M.J., adopted by Sannes, J.) ("Receiving letters of complaint from an inmate and failing

48

to respond is generally insufficient to establish personal involvement."); *Smart v. Goord*, 441 F. Supp. 2d 185, 198 (S.D.N.Y. 2002) (noting that the defendant "cannot be held liable on the sole basis that he did not act in response to letter of protest sent by [plaintiff]"); *accord, Chaney v. Vena*, 15-CV-0653, 2017 WL 6756645, at *7-8 (N.D.N.Y. Nov. 29, 2017) (Baxter, M.J.), *adopted by* 2017 WL 6734186 (N.D.N.Y. Dec. 29, 2017) (McAvoy, J.). Plaintiff has offered no admissible evidence establishing that Defendant Bosco acted on Plaintiff's letter through conducting an investigation or outright denying his requests. To the extent that Plaintiff argues that Defendants Bosco and McCulloch did not follow OMH policies regarding investigations into appeals, as already discussed above, a failure to adhere to an internal policy or state law does not constitute a violation of Section 1983. (Dkt. No. 94, Attach. 17, at 36-37 [Pl.'s Opp'n Mem. of Law].) *See Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights."). As a result, Plaintiff has not indicated any way supported by the evidence that Defendant Bosco was personally involved in the alleged constitutional violation.

However, Defendant McCulloch's response to Plaintiff's 2016 appeal does suggest at least some level of personal involvement. Defendant McCulloch stated in her declaration that she signed a written response prepared by someone else, noting that her procedure was to review that draft response and some associated documents if necessary to determine whether she agreed with the draft response, at which point she would sign it. (Dkt. No. 82, Attach. 7, at ¶¶ 18-21 [McCulloch Decl.]; *see also* Dkt. No. 94, Attach. 6, at 377-80 [testifying that she reviews the draft responses, ask questions or for further investigation if necessary, and often makes changes to the draft response].) Defendant McCulloch testified that she would not necessarily review

every document involved in an appeal, but "enough that I would know what I'm responding to." (Dkt. No. 94, Attach. 6, at 380.)  Even if Defendant McCulloch signed a draft primarily written by someone else, she acknowledges that it was her practice to review at least the most-pertinent documents involved, make changes to the draft response when appropriate, and conduct further investigation when appropriate.  Such actions indicate that Defendant McCulloch did not merely rubber-stamp a subordinate's decision but may have conducted a minimal level of personal investigation into the merits of Plaintiff's appeal.  The Court therefore finds that there is a genuine dispute of material fact as to whether Defendant McCulloch was personally involved in the alleged constitutional violation.

Based on the above, the Court must assess whether the actions of Defendants Waldron and McCulloch constituted deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment.

**b.      Deliberate Indifference to Serious Medical Needs**

Similar to the above claim related to conditions of confinement, a plaintiff asserting an Eighth Amendment claim related to deliberate indifference to serious medical needs must satisfy both objective and subjective tests: (1) to satisfy the objective test, the plaintiff must show that the alleged deprivation was sufficiently serious; and (2) to satisfy the subjective test, the plaintiff must show that the defendants were deliberately indifferent to the plaintiff's serious medical condition.  *Hilton v. Wright*, 928 F. Supp. 2d 530, 546-47 (N.D.N.Y. 2013) (Hurd, J.) (citing *Brock v. Wright*, 315 F.3d 158,162 [2d Cir. 2003]).  The objective component involves assessing (a) whether the plaintiff was actually deprived of adequate medical care (i.e., whether the care provided was reasonable), and (b) if so, whether the inadequacy in that care was sufficiently

serious. *Hilton*, 928 F. Supp. 3d at 547 (citing *Salahuddin v. Goord*, 467 F.3d 263, 279 [2d Cir. 2006]). As to this second consideration, if the Court finds that the plaintiff was completely deprived of treatment, it should examine whether the plaintiff's medical condition is sufficiently serious (i.e., a condition of urgency that may result in degeneration or extreme pain), while, if treatment was provided, it should assess the circumstances of the treatment rather than the severity of the underlying medical condition. *Hilton*, 928 F. Supp. 3d at 547.

As to the objective element, Plaintiff argues that (a) before June 2015, he received no mental health care as a result of being designated a MHSL 6, but that, (b) as of June 2015, he began to receive some (but, in his opinion, inadequate) care. (Dkt. No. 94, Attach. 17, at 35 n.27 [Pl.'s Opp'n Mem. of Law].) The evidence submitted by Plaintiff shows that he reported that his anxiety symptoms did not begin until approximately March 2013, at which point he had been subjected to SHU conditions continuously for approximately 17 years. (Dkt. No. 94, Attach. 16, at 21, 73.) Although Plaintiff was not receiving specific psychiatric care between March 2013 and June 2015 due to his designation as a MHSL 6 during that time period, medical treatment notes show that he was at least sporadically taking a medication for anxiety and pruritis. (Dkt. No. 94, Attach. 16, at 7-8, 16.) After his designation was changed to MHSL 3 in June 2015, the record shows that he attended monthly psychiatric evaluations with CNYPC from at least June 2015 through October 2016,[15] during which Plaintiff's mental status was assessed and he was prescribed a number of psychiatric medications with varying degrees of efficacy and side effects. (Dkt. No. 94, Attach. 16, at 32-64.) A further treatment note from March 2018 shows that

---

[15] The records submitted by Plaintiff along with his opposition memorandum of law do not post-date October 2016.

Plaintiff was taking psychiatric medications without side effects and without any notable symptoms. (Dkt. No. 82, Attach. 13, at 1-2.) Additionally, there are notes from approximately twice-monthly meetings of the Case Management Committee related to Plaintiff's OMH care spanning from July 9, 2015, to September 14, 2017.[16] (Dkt. No. 94, Attach. 16, at 85-194.) It is also undisputed that there were daily rounds by OMH staff (whether or not they were sometimes conducted when Plaintiff was out of his cell for recreation) and a weekly visit by the OMH Unit Chief, and that Plaintiff has been offered one prescriber appointment and two individual therapy sessions per month since June 2015.

Based on the admissible evidence, including the above, the Court finds that Plaintiff was not completely denied medical care for his mental health symptoms during any portion of the relevant time.[17] In particular, although Plaintiff alleges in the Amended Complaint that the medications prescribed in 2013 through early 2015 were allergy medications that were insufficient to treat his anxiety, he continued to be prescribed one of those medications by providers from CNYPC in 2015 and 2016, to whom he reported on multiple occasions that the medication helped him feel calm and improved his anxiety. (Dkt. No. 94, Attach. 16, at 32-64.)

---

[16]     The substantive content of these committee notes are redacted, but they show pertinent information including dates, Plaintiff's diagnosis, his status (e.g., stable), and various treatment recommendations including a recommendation to continue to monitor his condition on daily rounds and during private interviews.

[17]     The Court notes that Plaintiff has offered no evidence to indicate that he required mental health treatment for the issues relevant to this case before March 2013, given that he alleges, and the evidence shows, that he did not begin experiencing the relevant level of anxiety until that time, and the only allusion in his Amended Complaint to any mental health issues prior to that time is a single notation that he had been approved for mental health programming in 2007 and 2008, but that transfers to the relevant programs were denied by DOCCS' central office. (Dkt. No. 39, at ¶ 72 [Pl.'s Am. Compl.].)

He was also seen on occasion by CNYPC during the period between 2013 and June 2015 when he had mental health complaints, including thoughts of self-harm. (Dkt. No. 94, Attach. 16, at 67-82.) As a result, the Court finds that no reasonable factfinder could conclude that Plaintiff was completely denied treatment for his mental health concerns between March 2013 and June 2015. The analysis for the entire relevant time period is therefore whether any inadequacy of treatment was sufficiently serious, not whether his mental health conditions themselves were sufficiently serious.

The Court's first task is thus to determine whether the care provided was adequate. *See Salahuddin*, 467 F.3d at 279-80 (citing *Farmer v. Brennan*, 511 U.S. 825, 844-47 [1994]). As to the treatment received from March 2013 to June 2015, the record shows that Plaintiff went to the hospital on multiple occasions between 2013 and June 2015 for reports of symptoms variously including chest pain, shortness of breath, racing heart, headache, difficulty breathing and swallowing, and skin rash, during which he was primarily assessed for cardiac-related or allergy issues; none of these hospital visits appear to have included any assessment or mention of anxiety. (Dkt. No. 94, Attach. 6, at 54-63, 75-77, 90, 93-136.) Treatment within the correctional facility included reports of symptoms including chest pain, left arm numbness, heart palpitations, dizziness, and skin rash, which were also assessed for physical causes such as cardiac issues or allergies; again, these notes do not routinely indicate anxiety. (Dkt. No. 94, Attach. 6, at 67-69, 78-81, 86-88, 146-60.) A treatment note from April 16, 2013, indicates that Plaintiff reported increased anxiety and a desire to restart his OMH medications and notes that he was being sent for a further evaluation from mental health the following day; a treatment note from June 2015 indicates that he had a history of anxiety, but does not suggest any significant symptoms other

than an episode of racing heartbeat.  (Dkt. No. 94, Attach. 6, at 145, 155.)  It was noted on April 4, 2013, that he was provided allergy medication to aid with his anxiety and insomnia, and, on April 5, 2013, he was provided teaching on relaxation and slow-breathing techniques as well as information on how to ascertain his anxiety triggers; he reported that the allergy medications helped to lessen his anxiety.  (Dkt. No. 94, Attach. 6, at 81-84.)  A treatment note from CNYPC on April 11, 2013, following his transfer to Clinton Correctional Facility noted that Plaintiff had a diagnosis related to anxiety, but that he also had issues with high blood pressure and that his presentation was inconsistent with the reported anxiety and nervousness.  (Dkt. No. 94, Attach. 16, at 80, 82.)  Additional treatment notes also indicate that mental health staff were not convinced of the sincerity of Plaintiff's reports of anxiety at that time, but he was provided with various mental health screenings in April 2013 (when he was given medications for anxiety and thoughts of self-harm) and August 2014.  (Dkt. No. 94, Attach. 16, at 67-81.)  On August 5, 2014, Plaintiff's counsel sent a letter on which Defendant Waldron was copied in which she discussed the symptoms noted in the above treatment and hospital notes, which she attributed to Plaintiff's anxiety.  (Dkt. No. 94, Attach. 6, at 161-63.)  Defendant Waldron stated in her deposition that his MHSL was changed in June 2015 specifically because it appeared that he was asking for services, he was reporting an increase in symptoms at that time, and he was reporting that relaxation techniques were not working; Defendant Waldron also stated that it was based on the fact there appeared to be more information available for the social worker consulting with Plaintiff and that cardiac involvement in his symptoms was ruled out at that time.  (Dkt. No. 94, Attach. 5, at 390-92 [Waldron Dep.].)

Based on this and the totality of the admissible evidence, the Court finds that no

reasonable factfinder could conclude that the treatment provided between April 2013 and June 2015 was inadequate. Although Plaintiff and his attorney assert that his various physical symptoms during this time were the product of anxiety, the medical evidence, as discussed above, does not establish that treatment providers should have recognized those as being anxiety-related; rather, there is no indication that Plaintiff reported anxiety at most of these visits or that providers believed at that time that those symptoms were attributable to anxiety. Additionally, when sources diagnosed an anxiety-related disorder in April 2013, Plaintiff was provided with evaluations and observation as required (such as when he had a brief episode of thoughts of self-harm) by CNYPC, information about coping techniques such as relaxation and deep breathing, and medications for his allergies that he reported helped with his feelings of anxiety. Most of the "anxiety" symptoms that Plaintiff states he reported to OMH sources during this time were the physical manifestations for which he received extensive work-up and care from both DOCCS and hospitals, and he was able to address the other mental manifestations with CNYPC, who determined the most appropriate course of care based on their observations. In his deposition, Plaintiff acknowledges that, before he was on the OMH caseload, he was getting "O.M.H. medication through medical," although he states that he would have rather had therapy and other mental health programming because he did not want to be on medication. (Dkt. No. 82, Attach. 3, at 135 [Pl. Dep.].) However, whether a provided treatment is reasonable does not turn on what treatment a plaintiff prefers, but rather on what adequately addresses the medical condition. *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not

give rise to an Eighth Amendment violation."); *Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) (finding that temporary observation and short-term medication following incidents of self-harm were adequate and that defendants were not required to provide him long-term medication and treatment at a different facility). Given the limited evidence that his anxiety was the cause of his physical symptoms and resulting need for medical treatment, and the fact that he was still provided with mental health care in the form of OMH interventions and medication (which he reported were at least somewhat effective), the Court finds that there is no genuine dispute of material fact as to whether the care provided before June 2015 was adequate.

As to the treatment after Plaintiff's MHSL reclassification in June 2015, the record, as already discussed to some extent above, shows that Plaintiff was prescribed different medications at different times to address his anxiety, which he variously reported as being effective (although he believed some of these medications were causing allergic reactions), that he was able to address mental health concerns with CNYPC, and that he was generally noted to not display signs of anxiety or agitation during examinations. (*See, e.g.,* Dkt. No. 94, Attach. 16, at 34-64.) Plaintiff stated at his deposition that his definition of "proper O.M.H. care" (for which he had grieved prior to his reclassification) was "medication, therapy, social worker callouts, [and] psychiatrist callouts." (Dkt. No. 82, Attach. 3, at 142 [Pl. Dep.].) It is undisputed that Plaintiff was provided with provider and psychiatrist callouts as a result of his MHSL, and there is no admissible evidence to establish that he was denied any of the other aspects of what he considered "proper care." Again, the fact that the OMH Defendants did not place him in a mental health unit or program as he wanted does not mean that the care that they provided was inadequate or unreasonable. *Chance*, 143 F.3d at 703; *Barnes*, 926 F. Supp. 2d at 506. Plaintiff

also testified that his mental health situation has improved (at least to some degree) since he began receiving mental health therapies, but that the only thing that could really help is release from the SHU, something that, as already discussed, was not medical treatment and the OMH Defendants did not have the power to grant. (Dkt. No. 82, Attach. 3, at 145, 173-74 [Pl. Dep.].) The Court therefore finds that, even if Plaintiff was still experiencing some degree of mental symptoms, no reasonable fact finder could find that the care provided was inadequate to the point of establishing a constitutional violation. Because the objective element of this claim cannot be established based on the current record, no need exists to analyze the subjective element.

In any event, as to the subjective element, the OMH Defendants must have acted with deliberate indifference (i.e., they were actually aware of a substantial risk that serious inmate harm would result but failed to act); mere negligence is not sufficient. *Salahuddin*, 467 F.3d at 280-81. Based on the evidence already discussed above, the Court finds that Plaintiff also has not established that he could show that the OMH Defendants were deliberately indifferent to a risk of serious harm related to his treatment.[18]

For all of the above reasons, the Court grants Defendants' motion for summary judgment as to Plaintiff's Second Claim for deliberate indifference to his medical needs.

### C. Whether Defendants Are Entitled to Qualified Immunity With Regard to Plaintiff's Surviving Claims

After carefully considering the matter, the Court answers this question in the negative for the purposes of this motion for the reasons stated in Plaintiff's opposition memorandum of law.

---

[18] As already discussed above, whether there was a risk of serious harm specifically as a result of Plaintiff's retention in Ad Seg is not at issue for this claim because the OMH Defendants did not have the authority to change his placement within the correctional facility.

(Dkt. No. 94, at 38-39 [Pl.'s Opp'n Mem. of Law].)  To those reasons, the Court adds the following analysis.

Faced with the questions of fact that remain to be resolved in this case, the Court finds that it would be inappropriate to conclude that Defendants are entitled to the protection of qualified immunity at this stage of the litigation.  In particular, the Court notes that, although *Proctor* was decided in 2017 (after Plaintiff had already been in Ad Seg for a significant period of time, but still relevant to a portion of the period covered by this litigation), it was already well established that due process must be afforded in a "meaningful manner."  *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *accord Parratt v. Taylor*, 451 U.S. 527, 540 (1981); *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970).  Therefore, if a factfinder were to conclude that the Ad Seg reviews were guided by a pre-determined conclusion rather than a fair assessment of the facts, it would arguably mean that Defendants did not afford due process in a meaningful manner.  Additionally, as already discussed, the Supreme Court indicated in 2002 (well before Plaintiff was placed in Ad Seg) that the Eighth Amendment is violated by conditions that are totally without penological justification, and there remain material disputes of fact as to whether there was a legitimate penological justification for Plaintiff's continued retention in Ad Seg.  *Hope*, 536 U.S. at 737.  As a result, Defendants could be potentially found to have violated clearly established law depending on how a factfinder were to resolve the disputed issues of fact.  The Court therefore also denies Defendants' motion for summary judgment on the issue of qualified immunity.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 82) is

**GRANTED in part** and **DENIED in part** such that the following claims are **DISMISSED**:

(a)     Plaintiff's First Claim for unconstitutional conditions of confinement against the OMH Defendants;

(b)     Plaintiff's Second Claim for deliberate indifference to his serious medical needs against the DOCCS Defendants and the OMH Defendants;

(c)     Plaintiff's Third Claim for violation of his right to substantive due process; and it is further

**ORDERED** that **SURVIVING** these motions for summary judgment are the following claims:

(a)     Plaintiff's First Claim for unconstitutional conditions of confinement against Defendant O'Gorman, Defendant Porcelli, Defendant Randall, Defendant Lucia, Defendant Delisle, and Defendant Bellnier;

(b)     Plaintiff's Fourth Claim for violation of his right to procedural due process against Defendant O'Gorman, Defendant Porcelli, Defendant Randall, Defendant Lucia, Defendant Delisle, and Defendant Bellnier; and it is further

**ORDERED** that the Clerk is directed to contact counsel to schedule a settlement conference before Magistrate Judge Andrew T. Baxter. The parties are directed to engage in meaningful settlement negotiations before the settlement conference. In the event that counsel, after good faith negotiations, ultimately conclude that a settlement conference would not be productive, counsel may request to participate via telephone conference with Chief Judge Suddaby for a limited purpose of scheduling a trial date by electronically filing a letter request at least one week before the scheduled settlement conference.

Dated: March 12, 2020
      Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge